## STATE v YINGLING

Ohio Appeals, 9th Dist., Summit Co.

No. 3488. Decided July 24, 1942.

Matthews, PJ., & Ross, J., of the First District, and Guernsey, J., of the Third District, sitting in the Ninth District, by designation.

Alva J. Russell, Akron and George Farr, Akron, for appellee.

Wise, Roetzel & Maxon, Akron, for appellant.

## OPINION

By ROSS, J.

This is an appeal on questions of law from a judgment of the court of common pleas of Summit County, Ohio, containing the following:

"THEREUPON, it appearing to the satisfaction of the court that the character of the defendant and the circumstances of the case are such that it is not likely that he will engage in an offensive course of conduct, and that the public good does not demand or require that he be immediately sentenced, IT IS ORDERED THAT IMPOSITION OF SENTENCE BE, AND THE SAME HEREBY IS, SUSPENDED FOR A PERIOD OF FIVE (5) YEARS, upon the following terms and conditions, to-wit:

FIRST: That the said defendant, JACOB YINGLING, pay the costs of this prosecution properly taxed against him.

SECOND: That the said defendant voluntarily submit to confinement and imprisonment in the Summit County jail for a period of SIX (6) months, and abide by its rules and regulations.

THIRD: That the said defendant refrain from all offensive conduct and that he obey generally the laws of the State and the ordinances of the municipality within which he resides.

Since the United States of America is at war with powerful enemies who are threatening the basic liberties of our people, and as this court does not now know how essential the services the said defendant, JACOB YINGLING, may render are to this government's welfare, this court herewith reserves the right to adjudge, upon

proper application being made, the work and services defendant may render to be in lieu of said imprisonment, in whole or in part. The character of the work which may be considered in lieu of said imprisonment, in whole or in part, shall be left entirely to the judgment of this court for determination in the light of public good."

Passing the consideration that such judgment is without authority in law, in that it is neither a sentence of the defendant to punishment provided by law, nor a suspension of imposition of sentence, as provided for by **Chapter 31, Part Fourth, Title II** of the **General Code** (§§13452-1, et seq.) we proceed to a consideration of the questions raised by the appeal.

The chief contentions of the defendant are that he is entitled to a judgment by this court, discharging him from custody, or in lieu thereof to a new trial, on the ground the finding of the trial court is manifestly against the weight of the evidence.

Both contentions may be considered together.

Jacob Yingling and Richard Coburn were jointly indicted. The charge as set out in the indictment is:

"that Jacob Yingling and Richard Coburn in the County of Summit and State of Ohio aforesaid, on the 15th day of March, in the year of our Lord, one thousand, nine hundred and forty-one, unlawfully killed one Walter Lamb, Jr., contrary to the form of the statute in such case made and provided and against the peace and dignity of the State of Ohio."

These defendants waived a jury and were tried by the court alone. The trial court pursuant to request of counsel for defendants made and entered on the journal a finding of facts and set forth its conclusions as to the guilt of the defendants.

Coburn was found not guilty.

Yingling was found guilty as charged.

The attack upon the findings, conclusions and judgment of the trial court requires a minute examination of the evidence in the case. As indicative of the magnitude of the task thus presented to this court, it may not be amiss to here state that the trial occupied ten days—involved the examination of forty-one witnesses for the State, thirty-seven witnesses for the defendants, resulted in a bill of exceptions of seven hundred and sixty pages, and the finding and conclusions of the court cover twelve pages.

It is perfectly apparent that to include in this opinion any extensive or detailed review of the evidence would unduly extend it. However, the gravity of the charge, the importance of the principles involved to law enforcing officers as well as the public, and the desire of the court to establish the care with which this matter has been considered prompt the court to attach to this opinion an appendix containing a review of the evidence at least to the extent it applies to the remaining defendant Yingling. Such appendix will be found attached to the opinion.

For the purposes of the opinion proper, therefore, we content ourselves with a general statement as to our conclusions upon the evidence.

First, a prefatory statement of the facts in general.

Two men, Walter Lamb, the deceased, and Charles Sullivan, on the 15th day of March, 1941, had been drinking whiskey in a cafe

or saloon in the City of Akron, during the larger portion of the evening of that day.

About nine o'clock, they decided to leave the place which was called "The Short Stop Inn". As Lamb reached the door to the street, he staggered and almost fell prostrate. Sullivan and a bartender helped him to regain his feet. This was all observed by two cruising officers, Fassnacht and McAleese, who happened to be passing in their police car at the time. These officers stopped and ascertained that Lamb intended to drive himself and Sullivan to another part of the City. Sullivan, who was less intoxicated than Lamb, had no driver's license, and, therefore, could not drive the car. Lamb insisted he could and would drive. After refusing to permit the officers to leave his automobile key with the bartender until Lamb was fit to drive, his key was taken from him, and becoming boisterous a patrol wagon was called and Lamb and Sullivan, who was caught after trying to escape, were put in the wagon and taken to the city jail. Coburn drove the patrol wagon. Yingling acted as guard or "conductor".

Upon arrival at the police station, the prisoners were taken to the "searching room", searched, and registered by a Lieutenant Viereck. This occurred in front of a window, somewhat similar in character to a cashier's window in a bank. Lamb from the beginning of the operation of searching and registering was abusive, using violent and threatening language. Sullivan endeavored to obstruct the searching process. Lamb threatened officers specifically and generally, using the most provocative language. No actual physical encounter, however, occurred at this time. Some small change was taken from Lamb and given to the Lieutenant. This caused an exceptional tirade on the part of Lamb, who accused the police of being thieves. Lamb stated he could thrash any one or all of the police. More than enough occurred at this time to justify the conclusion in the mind of any reasonable person that the deceased was of a violent, combative and mean disposition, and that he would cause trouble if possible, that he despised and hated police officers as a class, bore toward them intense malice and would violently injure them gladly if given the chance. Beside this, it was apparent that he was then still intoxicated, but had recovered physically sufficiently to be a dangerous person. It is also obvious that the officers during the progress of the searching of his body became aware that he was unusually strong, being a man of twenty-three years of age, five feet, 11¾ inches tall, and weighing 190 pounds.

Coburn secured the keys to the cell room and door from behind the registry window, crossed the searching room to a solid steel door, opened this, proceeded through a short corridor to the box containing the locking device of a grated steel door opening into the cell room or "Bull Pen", where some dozen other prisoners were at large, most, if not all, of whom had been arrested this Saturday evening, charged with intoxication. Having unlocked this box, Coburn returned to the window, leaving the solid steel door open, deposited the keys, and took Lamb by the arm to conduct him to the cell room. When he reached the control box, he reached in, unlocked the door to the "Bull Pen", which either swung open or was pushed open by the prisoners from the inside. At this point Lamb offered resistance and endeavored to strike Co-

burn, who then drew his black jack and struck Lamb—who again attempted to strike Coburn, who, in turn, struck Lamb another blow with his black jack causing Lamb to reel backward and sprawl on his hands and knees, his head striking a door jamb, as he came back into the searching room. Coburn then returned to lock the door to the "Bull Pen". Yingling, who was still near the registry window, finishing the searching of Sullivan, heard the commotion in the cell room, but could not see either Coburn or Lamb until the latter came sprawling out into the searching room. Yingling turned Sullivan over to officer McGaha (who died after the preliminary hearing and before trial, and whose testimony at the preliminary hearing was read into the record) and walked toward Lamb who was struggling to his feet. Lamb first seized Yingling by the leg and then by the sweater and endeavored to strike Yingling, who then drew his black jack and struck Lamb who still was trying to strike the officer. Yingling hit again with his black jack. Yingling then broke Lamb's grip upon him, Lamb lost his balance and fell striking his head against an iron door jamb again. He lay quiet and was unconscious from this time on until his death on the 17th of March.

An autopsy showed that his death was due to one blow by some heavy blunt substance received upon the right side of the head above and to the rear of the right ear. The scalp showed other abrasions, but none of such a character as to cause death. Some bruises appeared upon the knees and elbows of the deceased.

Coburn was approximately of the same height and build as Lamb. Yingling was a man much older, suffered from a rupture, received when struggling with a prisoner some years before, and was more corpulent and obviously no physical match for a young man of Lamb's build, weight, and ability.

The evidence clearly discloses two separate encounters with the deceased and Coburn and Yingling. Neither officer was present or saw at least entirely the encounter with the other. Yingling was entirely ignorant of what had happened to Coburn in the cell room. As far as he knew Coburn might have been overcome, and as he knew he was occupied in unlocking the cell door and putting Lamb in could well have supposed the twelve drunken prisoners were about to be set free.

There is not one scintilla of evidence in the record showing definitely when, how, or where Lamb received the blow which caused his death. It might have been caused either by a blow from the black jacks of Coburn or Yingling. Any attempt to determine how, when, or where it was received requires the employment of speculation and conjecture. Such being the case, the charge of manslaughter completely fails, for in order for the State to prevail it is necessary to prove in this case beyond a reasonable doubt that Yingling committed an assault and battery upon Lamb and that the blow or fall occurring during such conflict caused the death of Lamb, and, further, that any unlawful act Yingling may have committed must be one which a reasonably prudent person would reasonably anticipate as resulting in death. This, the State wholly failed to do.

In Black v State of Ohio, 103 Oh St 434, the first and second paragraphs of the syllabus are:

"1. Unlawful killing, as used in

manslaughter, must be such as would naturally, logically and proximately result from the commission of some unlawful act, must be one that would be reasonably anticipated by an ordinarily prudent person as likely to result in such killing.

"2. Where such unlawful act does naturally and proximately result in death, all who participate in the commission of such unlawful act are in law liable for the commission of such unlawful killing."

See also: **Johnson v State of Ohio, 66 Oh St 59; Bandy v State of Ohio, 102 Oh St 384.**

There is no contention in this case that Yingling intended to kill Lamb. Even if so, the contention would be wholly untenable and absurd under the evidence, for it is apparent that any police officer would be aware that such offense would result in his undoing.

The State's case, therefore, is limited to proof of some unlawful act, to-wit: assault and battery by Yingling, and that such battery caused Lamb's death, and that the acts committed by the defendant Yingling were such that a reasonable man would anticipate that death would result. Such is the holding in the cases noted. Coburn has been found not guilty, so that if such acts were committed by him, they cannot be imputed to Yingling, the evidence wholly also failing to show any element of conspiracy between Coburn and Yingling; their only connection being that they were both members of the same police force. Such relationship is not enough to justify a finding of conspiracy, and thus responsibility of each for the acts of the other.

We leave this phase of the case therefore with the conclusion that the state wholly failed to introduce any evidence (nor was there any evidence of the defendants) showing that Yingling caused the death of Lamb, and were it not that the charge set out in the indictment included also the charge of assault and battery, we would be here content to render judgment of dismissal of the defndant Yingling.

Both of my associates agree with me that there was no evidence sustaining the principal charge of manslaughter. Their conclusions as to the included offense of assault and battery together with my own action with reference to the same will be found stated hereinafter.

Was there such evidence introduced as requires this court either to diminish the charge or remand the case for a new trial?

There are certan considerations that present themselves at the beginning of the solution of this problem.

In neither the case of Coburn nor Yingling was the assault commenced by the defendants. Some of the State's witnesses so testified. An examination of the finding of the trial court discloses that their evidence was considered rightly unworthy of belief. In this respect this court is in a secure position, which would not be the case if it were compelled to rely upon a general verdict of a jury. The court knows that the trial court found as facts that Lamb endeavored to assault both Coburn and Yingling. It is true that as far as Yingling is concerned, the finding is not as positive as that in the case of Coburn. However, the trial court stated:

"As Lamb was getting up from the floor he and Yingling caught hold of each other, whereupon Yingling struck him with his blackjack several times on his head, the

442

last blow knocking him to the floor and rendering him unconscious instantly and inflicting the injuries herewith described."

It is also interesting to note that the only evidence indicating that Lamb was not attempting to assault Yingling at the time Yingling struck him was from witnesses whom the trial court refused to believe as to other critical matters to which they testified. If their testimony on such matters was not worthy of credit, it is difficult to see why upon the one point of initial attack upon Yingling they should be believed. These same witnesses, so discredited by the trial court, testified to matters which should have resulted in the conviction of Coburn, yet the trial court found him not guilty, thus demonstrating his complete disbelief in their veracity.

In connection with the testimony of the witnesses of the State, who were confined as prisoners in the cell block, I must observe that the testimony of such witnesses offered such violent contradictions—such impossible accounts, that after reading the evidence of the State including the admissions of Coburn and Yingling, the mind is left in a state of complete uncertainty as to just what occurred.

Even if such were not the case, Yingling had a perfect right to take hold of Lamb and to use force, if Lamb resisted his efforts to subdue him A police officer attempting to put a prisoner in a cell is in a manifestly different position from an ordinary civilian engaged in a physical encounter. The civilian's duty is to cease offensive measures when in a position of reasonable safety. The obligation of the officer is a positive one requiring him to go forward with his duty even after he is assured of his personal safety. In fact, the officer's safety is a minor consideration. It was Yingling's duty to see that Lamb was subdued and to put him in his cell. He had four courses open to him. He could have evaded this duty and retreated. He could have used his fists. He could use the black-jack, part of the standard equipment of an officer, or he could have used his revolver, with which he was then armed. I find no credible evidence, evidence which the trial court considered worthy of belief, justifying the conclusion that resort to the black-jack in the face of his imposed duty constituted the use of excessive force under the circumstances. It must be remembered that the doors of the rooms leading to the outside were open—Yingling had every reason to believe the door to the "Bull Pen" containing a dozen prisoners, in various stages of intoxication, was open, as it really was. It must also be considered that men under the influence of liquor are not normal and when possessed of contentious, vicious temperaments, such as that possessed by Lamb, and considering police as their oppressors, will go to lengths which would not be reasonably anticipated under normal conditions.

I am not unaware that the State introduced the testimony of nineteen witnesses, tending to show the character of Lamb as a peaceable citizen was good. This evidence is almost wholly negatived in effect, however, by information elicited from State's witnesses showing that Lamb had been in some half dozen brawls in which he was the aggressor, and by the evidence of one character witness for him in which it was admitted that both the witness and Lamb had been convicted and sentenced for assaulting an officer.

The law as to an officer's duty

to arrest and imprison a law violator is well settled.

**Sec. 13432-1 GC,** provides:

"A sheriff, deputy sheriff, marshall, deputy marshal, watchman or police officer, herein designated as 'peace officers' shall arrest and detain a person found violating a law of this state, or an ordinance of a city or village, until a warrant can be obtained. * * *"

In **Drolesbaugh v Hill, et al, 64 Oh St 257,** at page 264 of the opinion, the court say:

"An officer in making an arrest has the right to use such force as may be necessary to overcome any resistance to the execution of his office, offered by the person to be arrested; but he must use no more force or violence than is reasonably necessary for the purpose; and if he does he makes himself and his sureties liable upon his bond to the party injured."

In **State v Sells, 30 Oh Abs, 355,** the first paragraph of the syllabus is:

"1. A peace officer is not liable for injures inflicted by him in the use of reasonably necessary force to overcome resistance to his authority; an officer making an arrest is justified in using sufficient force to subdue the prisoner although not acting in self-defense, but if he uses unnecessary force, or if he assaults the person whom he is arresting without just cause or excuse, especially after resistance to his authority ceases, he loses the protection of the law."

In 4 Am. Jur., 54, it is stated:

"An officer attempting to make a lawful arrest for a misdemeanor is under no obligation to retreat or retire to avoid the necessity of using extreme measures to prevent receiving great bodily injury. It is his duty to press forward for the accomplishment of his purpose. * * *"

A quotation from 6 C. J. S. page 612 is particularly pertinent:

"An officer who is making a lawful arrest, or who has made an arrest, is justified in using such force as is reasonably necessary to secure and detain the offender, overcome his resistance, prevent his escape, recapture him if he escapes, and protect himself from bodily harm; but he is never justified in using unnecessary force or treating his prisoner with wanton violence, or in resorting to dangerous means when the arrest could be effected otherwise, although it has been held that an officer is not bound to ask assistance of bystanders before he uses force to accomplish his purpose alone.

Within reasonable limits the amount of force permissible to effect an arrest and the means employed are necessarily left to the sound discretion of the officer, and it has been held that this discretion is not subject to review by a court or jury unless wantonly or maliciously abused. It has also been held that the measure of force permissible in making an arrest is that which an ordinary, prudent, and intelligent person with the knowledge, and in the same situation as the arresting officer, would have deemed necessary. The officer is not required to determine at his peril the precise amount of force necessary in each instance and to use that much and no more, and he may be guided by the reasonable appearances and the nature of the case in determining the amount of force to be used."

See also: 6 C. J. S. 825; 3 O. Jur. 171, 172; 2 R. C. L. 539; 4 Am. Jur. 53; Clark, Admrx., etc. v Carney, et al., 36 Oh Abs 68.

The whole matter, therefore, narrows down to the question of whether under the circumstances prevailing in the instant case the trial court was justified by any evidence which it deemed credible in concluding that Yingling had used excessive force in subduing Lamb and in carrying out his duty of putting him in his cell. We find no such evidence in the record.

Reference to the findings of the court which were journalized and included among the original papers sustains this conclusion as before stated.

Considerable attention in the briefs of counsel has been given to the subject of self-defense. As I have pointed out, the instant case presents a situation which calls for a rule far different from that prevailing in cases in which self-defense alone is a proper cloak for the acts of the defendant. However, Yingling, of course, was entitled to the benefit of the provisions of such rule, so far as the same were applicable. Even in such cases "the law does not measure nicely the degree of force which may be employed by a person attacked" in protecting himself from assault. Stewart v State of Ohio, 1 Oh St 66, 72.

In reaching my conclusion that the defendant Yingling should be discharged, I am not unmindful of the language used by the Supreme Court in the case of Cooper v State of Ohio, 121 Oh St 562. At pages 569 and 570 the Court say:

"The Court of Appeals, in reviewing a criminal case upon the weight of the evidence, owes a greater duty than to determine merely whether there was 'some evidence' tending to support the verdict. In such situation, if the Court of Appeals is unable to determine from the record wherein the truth lies between conflicting evidence, it may well adopt the conclusion of the jury and the trial court; they being in a better situation to judge of the truth by reason of their opportunity to see the witnesses and observe their conduct. But where the truth is manifest upon the record itself, by reason of the absence of conflict, or by any other sound reason, the Court of Appeals cannot escape its duty to determine whether the verdict and/or judgment is supported by the degree of proof which the character of the case requires."

Where there is a conflict in the evidence of credible witnesses, a reviewing court may well, yes must, bow to the conclusion of the trier of the facts, but, where, upon a reading of the record, it becomes manifest that the trier of the facts pleaced no credence in the testimony of witnesses adverse to the contention of the defendant, certainly, the duty to do what the trial court ought to have done becomes apparent and the defendant should be discharged.

I also find myself at a loss in contemplating the discharge of Coburn in the face of the evidence of such discredited witnesses, accompanied by a finding of guilty against Yngling. Certainly, this action is not consistent.

It being the obligation of the State to prove that Yingling committed an unlawful act, to-wit: an unwarranted assault and battery upon Lamb and that such battery caused his death and the evidence wholly failing to show that his death was caused by anything Yingling did, the main charge fails completely against the defendant,

Yingling. There is further no evidence that a reasonable person should have reasonably anticipated that his acts would cause the death of Lamb, and, for this reason also, the main charge would fail.

It being the further duty of the State, in order to sustain a conviction on the included offense of assault and battery to prove beyond a reasonable doubt that Yingling used excessive force in accomplishing his duty as a police officer in incarcerating Lamb under all the circumstances of this case, and it appearing from the record that there is no credible evidence that Yingling did use such excessive force, the State fails on the included offense of assault and battery, and the defendant Yingling should, therefore, be discharged.

In view of the fact that my associates conclude that there is sufficient evidence presented to warrant a retrial upon the charge of assault and battery, although the evidence appearing in the case was not of that degree of proof which would sustan a conviction upon such charge, the verdict being manifestly against the weight of the evidence, I concur with my associates in a judgment reversing the judgment in this case and in an order remanding the case for a new trial.

MATTHEWS, PJ., & GUERNSEY, J., concur.