DECISION AND JOURNAL ENTRY
This cause was heard upon the record in the trial court. Each error assigned has been reviewed and the following disposition is made:
On November 7, 1997, a jury in the Lorain County Court of Common Pleas found that Layne Kuhns, Jr. and his parents, Layne Kuhns, Sr. and Brenda Kuhns, (collectively "the Kuhns"), were not liable for the death of Tony Cushing. On December 5, 1997, the plaintiff, the estate of Tony Cushing[1] ("Estate"), filed notice it was appealing that decision. The Estate has argued that the trial court abused its discretion by (1) excluding an audio recording of a 911 call, and (2) forbidding impeachment cross examination using questions based upon information gained from the 911 tape. On December 19, 1997, the Kuhns filed notice that they were cross appealing. The Kuhns have argued that the trial court erred by overruling their motion for a directed verdict determining that Layne Kuhns did not negligently cause the wrongful death of Tony Cushing.
 I
Layne Kuhns and Tony Cushing, ages sixteen and seventeen, had been friends for years, apart from a recent falling out. On February 25, 1995, Cushing and Kuhns had a fight that left Cushing comatose, and later dead, and Kuhns defending himself against civil charges that he wrongfully caused the death of his friend. The fight started when Cushing kicked in the door to Kuhns' residence and punched Kuhns in the mouth. Kuhns wrestled Cushing to the ground and held him around the neck until police arrived. During the altercation, a call was made to 911 which was transferred to the Elyria Police Department. Both Kuhns' sister, Janeva, and Janeva's friend Jessica Green spoke with the Elyria Police Dispatcher. The two, alternately, remained on the line with the dispatcher until the police arrived. Automatic taping devices of the Lorain County 911 Agency and the Elyria Police Department, when taken together, recorded the entire conversation. Those devices also recorded the simultaneous exchanges Janeva and Green had with Kuhns.
Cushing never fully regained consciousness. While Cushing was still alive, his mother brought suit on his behalf against Kuhns and his parents. When Cushing died nearly ten and one half months later, his estate continued the suit. The Estate alleged that Kuhns "negligently and/or intentionally" caused the injuries that led to Cushing's death, and that Kuhns' parents were liable, pursuant to R.C. 3109.10, for the injuries willfully and maliciously caused by their son. It contended that, even if self defense was initially justified, Kuhns should have released Cushing once he was subdued. It argued that it was not Kuhns' defensive action that killed Cushing, but Kuhns continued choking of Cushing after he was subdued. Kuhns argued that, because he was defending himself, he is not liable for Cushing's death. In this appeal he has also argued that, because Cushing was a trespasser, he owed Cushing no duty of care and thus could not have negligently caused Cushing's death.
During the trial, conflicting or inconclusive testimony was heard regarding (1) how long the entire incident lasted; (2) how long Cushing struggled before losing consciousness; (3) how long Kuhns kept his arm around Cushing's neck after Cushing lost consciousness; (4) the timing and content of statements made to Kuhns urging him to release Cushing; and (5) responses by Kuhns to those statements. The Estate proffered an audio tape and transcript that it asserted were made from the master tape, or from copies thereof, of the portion of the 911 call received by the Elyria Police Department. Testimony established that (1) the portion of the 911 call that was transferred to the Elyria Police Department was automatically recorded; (2) the master recording is routinely destroyed after thirty to sixty days; (3) when the recording of a call is needed for an investigation, the standard procedure is for the officer in charge of the investigation, a lieutenant, or captain, to make a copy from the master recording before it is destroyed; (4) the recording system was working on February 25, 1995; (5) Lieutenant McLean copied the tape of the emergency call, labeled the copy with the Elyria Police Department investigation number, marked it "radio-phone traffic[,]" put his initials on it, and retained it in the case file;[2] (6) Lieutenant McLean transferred the file, including the tape, to Detective Leiby when McLean retired from the force; (7) the copy of the tape made by Lieutenant McLean, and identified in court by Detective Leiby, was in the possession of Detective Leiby since he received the case file containing it from Lieutenant McLean; (8) Detective Leiby gave a copy of the file tape to Lorain County Prosecutor Gregory White; (9) White gave two audio tapes, purportedly of the 911 call, to Ronda Cushing, Tony Cushing's mother ("Ronda"); (10) the trial court specifically denied the Estate the opportunity to present testimony from White, which could have established whether the copies of the tape which he gave Ronda included, or were made from, the tape he received from Leiby; (11) Ronda gave the better copy of the tapes she received to Orie Camillo, a court reporter, for transcribing; (12) Ronda identified the voices of Malinda Cushing, Layne Kuhns, Janeva Kuhns, and Jessica Green on the copy of the tape she gave to Camillo; and (13) Camillo transcribed the tape.
The Estate made several motions to admit the tape into evidence. Each time, the court overruled the motion with little or no explanation. The most detailed explanation came in response to the final proffer:
 Mr. Buss: Yes. We renew our motion for the admission of the 911 tape which I think is Exhibit 2 and also the transcript based on further evidence that was produced.
 Ronda Cushing identified all the voices on this recording. She testified that she obtained the 911 tape from Prosecutor White after going through her congressman and somebody else.
 The Court: It was a councilman, not congressman — representative I should say.
 Mr. Buss: Right. Prosecutor White handed her two of those tapes. We had earlier subpoenaed Prosecutor White. The subpoena was quashed and we renew again our request that we be allowed to subpoena him. Prior side bar indicated that Mr. Davies —
 The Court: Not necessary. The Court has no reason to doubt what Mrs. Cushing's testimony was, she did obtain the tape from Prosecutor White.
 If that was the reason you wanted to subpoena him, to say that he handed it to her, the Court will accept her word. That is where she did get the tapes.
 Mr. Buss: Right. I think that Mr. White could be the chief law enforcement officer, could testify to the chain of custody here.
 The Court: I don't know that he can testify to the chain of custody. I don't know what took place, whether they were copies or what have you.
 I don't now that the chain of custody can come from Prosecutor White.
 Mr. Buss: Anyway, together with that testimony and Detective Al Leiby's, who kept custody of this particular tape in the investigation —
The Court: Mr. Buss, excuse me for interrupting you.
 I shouldn't because you have a right to be heard straight.
 As I indicated to you, there is one reason only that the Court is excluding it, it hasn't been presented properly.
 Why don't you get the person who received the tape to come in and say that that is it?
She is available.
 Mr. Buss: When you subpoena records, people for hospital records, you don't have to have people actually who prepared the record here.
 The Court: They testify to these things but this is altogether a different thing.
These things are kept for what, 60 days:
 There is [sic] a number of questions involved on this, Mr. Buss. You know, I think that properly brought forward this tape can be admitted. I have no difficulty with it, but you have not done it yet.
* * *
 The Court: Bring the lady who took it and she can testify to it and you got it in as far as this Court is concerned.
In addition to excluding the audio recording of the 911 call, the court limited impeachment questioning on cross examination. Initially, the trial judge permitted eight questions about specific statements allegedly made by or to Kuhns during the 911 call. Kuhns denied knowledge or recollection of each. Following that exchange, the judge sustained objections to further similar questions. No reason was given by the court for its limitation, but the judge did not dispute the characterization by the Kuhns that the questions were an "attempt to utilize the 911 tape which has not been properly identified * * * [and for which] the Court has ruled * * * the chain of custody was not followed * * *."
 II
"The admission or exclusion of relevant evidence rests within the sound discretion of the trial court." State v. Sage (1987),31 Ohio St.3d 173, paragraph 2 of the syllabus. The judgment of the trial court will be reversed only if the reviewing court finds that the trial court clearly abused its discretion by excluding the proffered evidence, and that the exclusion materially prejudiced the complaining party. State v. Hymore (1967), 9 Ohio St.2d 122,128, certiorari denied (1968), 390 U.S. 1024,20 L.Ed.2d 281. To find an abuse of discretion, the reviewing court must find that the trial court's actions were "unreasonable, arbitrary, or unconscionable." State v. Adams (1980), 62 Ohio St.2d 151,157. Material prejudice exists when, after weighing the prejudicial effect of the errors, the reviewing court is unable to find that without the errors the factfinder would probably have reached the same decision. Cf. Hallworth v.Republic Steel Corp. (1950), 153 Ohio St. 349, paragraph 3 of the syllabus.
 A. Exclusion of the 911 tape
Audio recordings of 911 calls, if properly authenticated and relevant, are generally admissible under the "excited utterances" exception to the hearsay rule. State v. Smith (1997), 80 Ohio St.3d 89,107, certiorari denied (1998), ___ U.S. ___,140 L.Ed.2d 949. Statements made by a party, recorded on a tape of a 911 call, and offered against that party are admissions by a party opponent, rather than hearsay, and are generally admissible. Evid.R. 802(D)(2). In this case, the trial judge specifically stated that the tape was admissible, if "presented properly." By this, we understand him to mean that, were it not for questions of authentication, he would have admitted it.
Authentication requires the presentation of "evidence sufficient to support a finding that the matter in question is what its proponent claims." Evid.R. 901(A). Authentication does not always require a strict chain of custody. State v. Richey
(1992), 64 Ohio St.3d 353, 360, certiorari denied (1993),507 U.S. 989, 123 L.Ed.2d 157. So long as the requirements of Evid.R. 901(A) are met, contamination of the chain of custody goes to weight rather than admissibility. Id.
In the case sub judice, the trial court excluded the tape because the Estate did not get the woman "who received the tape to come in and [identify] it[.]" This woman is not identified in the record, nor is there any further clarification of her role as to the authentication of the tape. What is in the record about the creation and custody of the tape is articulated in detail above. In summary, the record indicates the creation of the original tape was done automatically on a device that was functioning at the time of the call. It also establishes that a copy was made from the original tape, which was uniquely identifiable by markings placed on the copy by the detective who made it, and that the copy was in police custody from the day of its creation to the day of trial. Most of the voices on what was represented as a copy of that tape were identified by Ronda Cushing, who was familiar with the voice of each person she identified. This evidence, which is contained in the record, is sufficient to support a finding that the tape is what it is purported to be.
Even so, it is still within the discretion of the trial court to exclude the tape so long as it is not done in an arbitrary, unreasonable or unconscionable manner. A recording captures and conveys timing, manner of speaking, and exact wording of conversations in a way that is impossible for witnesses to do while testifying at trial. Under any circumstances, a recorded "witness" would be helpful; here, it is even more crucial. The witnesses were young, none older than seventeen, emotionally and familially entangled with each other, and confronted with the violent death of one of them. Their testimony at trial is more telling of the emotional impact the incident had on them than of the factual details necessary to decide the wrongful death action that resulted. The testimony is rife with memory lapses and internal conflicts. In many instances, the testimony given by one person on direct examination flatly contradicts the testimony on cross examination of the same person. Given the substantial gaps and conflicts in the testimony of those who were present, the inherent reliability of the recording process, and the availability of an admissible recording of the events that was created and cared for in accordance with standard police procedure, it was unreasonable to exclude the proffered tape.
 B. Harmless Error Analysis
Having found that it was error to exclude the audio recording of the 911 call, we must reverse, unless we find it probable that the jury would still have reached the same decision even if it had heard the wrongfully excluded evidence. The jury found that Kuhns acted in self defense in subduing Cushing. It also found that his actions were not negligent.
In finding that Kuhns acted in self defense, the jury indicated it believed Kuhns' showing (1) that he was not at fault in creating the situation giving rise to the affray; (2) that he had a bona fide belief that he was in imminent danger of death or great bodily harm and that his only means of escape from such danger was in the use of such force; and (3) that he did not violate any duty to retreat or to avoid the danger. See State v.Palmer (1997), 80 Ohio St.3d 543, 563-64. The tape recording does not begin until after the fight is underway, so it should not have altered the jury's decision on the first element. As to the third element, Kuhns was in his home at the time Cushing attacked him. Because an individual does not have a duty to retreat in his own home, the tape would not have altered the jury's decision on the third element. See State v. Thomas (1997), 77 Ohio St.3d 323, 327.
The tape recording could easily have altered the jury's decision on the second element, however. When the jury found Kuhns not liable because he acted in self defense, they necessarily found that he had a bona fide belief that he was in imminent danger of death or great bodily harm and that his only means of escape from such danger was by using the degree of force administered. An individual who uses force in self defense, however, has a "duty to cease offensive measures when in a position of reasonable safety." State v. Yingling (1942), 36 Ohio Law Abs. 436, 442. Because the tape does not record the beginning of the altercation, it would not have undermined the jury's determination that Kuhns, initially, reasonably believed that he was in danger of imminent death or great bodily harm. Kuhns held Cushing around the neck for several minutes, however, and at some point Cushing ceased to be a threat. The tape contains statements made by individuals who were present, and observed first hand that "he don't look like he's breathing." It also contains statements made by Kuhns that indicate he may have been acting out of something other than a belief that he was in danger. At one point, in response to a question about whether Cushing was still moving, Kuhns responded, "I don't give a crap." The tape also provides an accurate time line, against which Kuhns continued restraint of Cushing can be measured.
In contrast, the testimony from eyewitnesses was confusing and contradictory. Jessica Green could only establish that it was "[m]inutes" between the time Kuhns got Cushing in a headlock and the time she left to go to a neighbor's house. At one point, she agreed that Cushing stopped struggling when she left for the neighbor's house, and later she agreed that Cushing did not stop struggling at any time before "[Kuhns] released the hold on [Cushing.]" She could not recall many of the comments made to Kuhns, or his responses to them, and at one point said that he "just totally like quit saying anything." Janeva Kuhns, the only other person continuously present, did not testify. Given the contrast between the evidence which the jury was permitted to consider and the contents of the tape, we cannot say that, had the error not been made, the outcome probably would have been the same.
Because the trial court erroneously excluded the proffered tape of the 911 call, and because the error was not harmless, we sustain the first assignment of error.
 III
The second assignment of error challenges the limitations the trial court placed on questions during cross examination of Kuhns. Because it, too, is an evidentiary question, we may sustain the assignment of error only if the trial court judge clearly abused his discretion in making the decision, and the error materially prejudiced the complaining party.
 A. Limitation on Cross Examination Questions
The Estate called Kuhns as a witness, and was permitted to examine him directly as if on cross examination. It asked him eight questions that were based on statements it learned of from the audio tape of the 911 call. The judge forbade any further questioning based on statements contained in the 911 tape. The record does not reflect the basis for the limitation, although contemporaneous statements by counsel for both sides indicate their belief that it was imposed because of the prior exclusion of the 911 tape. Evid.R. 607(A) permits impeachment of any witness by prior inconsistent statements that are admitted as exceptions to the hearsay rule or because they are admissions by a party opponent.[3] See, also, Evid.R. 801(D)(2), 803. Because we have found that the tapes should have been admitted, the Estate should also have been permitted to question Kuhns based on the statements contained in the 911 tapes.
 B. Harmless Error
Even though error was made, to merit reversal the error must not have been harmless. In response to the eight questions permitted, Kuhns testified that he did not know, or did not recall, whether specific statements were made during the altercation. It is unlikely that further questions would have elicited any significantly different response. The value of the questions, therefore, was in showing that Kuhns' specific memory of the altercation was poor or in having the jury hear the words contained on the tape. The former was accomplished by Kuhns' responses to the initial questions. With respect to the latter, had the trial court not erred by excluding the tape, the jury would have heard the words directly from the participants. Nothing of substance would have been gained by the Estate's repetition of them.
Although it was error to exclude impeachment questioning because it was based on the contents of a wrongfully excluded 911 tape, the error was harmless. The second assignment of error is overruled.
 IV Kuhns' Cross Appeal
App.R. 4(B)(1) provides that, "[i]f a notice of appeal is timely filed by a party, another party may file a notice of appeal within the appeal time period otherwise prescribed by this rule or within ten days of the filing of the first notice of appeal. The time periods for cross appeals pursuant to App.R. 4 are mandatory and jurisdictional. Kaplysh v. Takieddine (1988), 35 Ohio St.3d 170, paragraph one of the syllabus.
In the case sub judice, the judgment of the trial court became final and appealable on November 7, 1997. Either party was permitted to appeal that judgment by properly filing a notice of appeal by December 8, 1997.[4] The plaintiff, the Estate, did so on December 5, 1997. This court has jurisdiction over a cross appeal filed by the Kuhns, so long as notice of that cross appeal is timely filed. To be timely, notice must be filed by December 15, 1997, which is the later of December 7, 1997 or ten days after the filing of the Estate's notice of appeal. The Kuhns filed their notice of appeal on December 19, 1997, four days late. Because the time limits governing appeal are jurisdictional, this court is not permitted to entertain the cross appeal. Accordingly, it is dismissed.
 V
Because sufficient evidence was presented to support a finding that the 911 tape was what it was asserted to be, it was admissible. The error made in excluding it was not harmless, so the Estate's first assignment of error is sustained. Although the trial court also erred in excluding certain impeachment cross-examination questions, that error was harmless. The Estate's second assignment of error is overruled. The judgment of the trial court is reversed in part, and affirmed in part. The cause is remanded for further proceedings consistent with this opinion.
The Kuhns' cross appeal is dismissed as untimely, since it was filed four days after the expiration of jurisdictional time limits.
Judgment affirmed in part, reversed in part, and causeremanded.
 Cross appeal dismissed.
The Court finds that there were reasonable grounds for this appeal.
We order that a special mandate issue out of this Court, directing the County of Lorain, Court of Common Pleas, to carry this judgment into execution. A certified copy of this journal entry shall constitute the mandate, pursuant to App.R. 27.
Immediately upon the filing hereof, this document shall constitute the journal entry of judgment, and it shall be file stamped by the Clerk of the Court of Appeals at which time the period for review shall begin to run. App.R. 22(E).
Costs taxed equally to both parties.
 Exceptions. _______________________________ WILLIAM R. BAIRD, FOR THE COURT
SLABY, P. J., CONCURS
[1] The plaintiff to the original suit was Ronda Cushing, as Next Best Friend, Natural Parent, and Legal Guardian of Tony Cushing, Incompetent Person. When Tony Cushing died, a suggestion of death was made to the trial court, in accordance with Civ.R. 25(E). Subsequently, a motion to amend the complaint "to reflect that this is now a wrongful death action" and to "accurately reflect plaintiff Ronda Cushing's appointment as administratrix of Tony Cushing's estate" was filed. No official motion to substitute a party was made, although reference to Civ.R. 25(A), which provides for the substitution of parties, was contained in the motion to amend the complaint. The amended complaint was captioned, "The Estate of Tony Cushing, by and through its Administrator and Natural Mother, Ronda Cushing." We construe this as a substitution of parties pursuant to Civ.R. 25. Despite the inclusion of "et al." in many of the captions in both the trial court and this court, no additional plaintiffs were added to the case. Because of this, the sole plaintiff and appellant is the estate of Tony Cushing.
[2] The actions of Lieutenant McLean were described by Detective Leiby. The Kuhns, on appeal, asserted for the first time that the statements by Detective Leiby about McLean's actions were "hearsay." The law is well settled in Ohio that errors which arise during the course of civil proceedings and which are not brought to the attention of the trial court at the time they can be remedied are waived, and may not be reviewed on appeal. LeFort v. Century 21-Maitland Realty Co.
(1987), 32 Ohio St.3d 121, 123; Sheeler v. Ohio Bur. ofWorkers' Comp. (1994), 99 Ohio App.3d 443, 447. Accordingly, this court will not review the Kuhns' assertions on appeal that Detective Leiby's statements were hearsay and should not have been admitted.
[3] The Estate has argued that the questions were proper under Evid.R. 607(B) because it had a reasonable belief that they had been made. The Estate's argument regarding impeaching facts is well taken. A close reading of Evid.R. 607(A), however, indicates that there may be subtle distinctions between the use of impeaching facts and the use of certain prior inconsistent statements. Because this court holds that the 911 tape should have been admitted we need not determine whether the questions would have been permissible pursuant to Evid.R. 607(B).
[4] December 7, 1997 was a Sunday.