OPINIONS OF THE SUPREME COURT OF OHIO

The full texts of the opinions of the Supreme Court of Ohio are being transmitted electronically beginning May 27, 1992, pursuant to a pilot project implemented by Chief Justice Thomas J. Moyer.

Please call any errors to the attention of the Reporter's Office of the Supreme Court of Ohio. Attention: Walter S. Kobalka, Reporter, or Justine Michael, Administrative Assistant. Tel.: (614) 466-4961; in Ohio 1-800-826-9010. Your comments on this pilot project are also welcome.

NOTE: Corrections may be made by the Supreme Court to the full texts of the opinions after they have been released electronically to the public. The reader is therefore advised to check the bound volumes of Ohio St.3d published by West Publishing Company for the final versions of these opinions. The advance sheets to Ohio St.3d will also contain the volume and page numbers where the opinions will be found in the bound volumes of the Ohio Official Reports.

The State of Ohio, Appellee, v. Richey, Appellant.

[Cite as State v. Richey (1992),     Ohio St.3d     .]

Criminal law -- Aggravated murder -- Death penalty upheld, when.

(No. 90-338 -- Submitted March 17, 1992 -- Decided August 12, 1992.)

Appeal from the Court of Appeals for Putnam County, No. 12-87-2.

Around 4:15 a.m., on June 30, 1986, in Columbus Grove, Ohio, a raging fire broke out in Hope Collins's second-floor apartment, killing Cynthia Collins, Hope's two-year-old daughter. Less than an hour before, Hope had left her apartment after Kenneth T. Richey, defendant-appellant, agreed to baby-sit Cynthia. Circumstantial evidence established that while in Hope's apartment, Richey had spread gasoline and paint thinner around the apartment and ignited it.

Richey, Hope, Peggy Price, Candy Barchet, Richey's ex-girlfriend, and a variety of other witnesses to these events lived at the Old Farm Village Apartments in Columbus Grove. Peggy and Hope lived in adjacent second-floor apartments, and Candy lived directly below Hope. All three apartments were in Building or Section "A" at Old Farm Village. Candy and her infant son moved into their apartment around June 15, and she met Richey. Within a few days, Candy and Richey formed a sexual relationship, and Richey frequently told Candy he loved her and "would kill any other guys" she was with.

On June 24, Richey learned that Candy had just been in bed with John Butler, and Richey pulled a knife on Butler. In response, Butler "bounced him around the room a little bit." Just after that fracas, Richey broke his hand by punching a door, requiring a splint.

On Sunday evening, June 29, Candy took her new boyfriend, Mike Nichols, to a party in Peggy's apartment; during the party, Candy kissed Nichols openly and told Richey that she wanted to date Nichols. Richey became upset at this news. When Candy went home, around 1:00 a.m., she asked Nichols to spend the night with her, which he did.

That night, Richey wore his Marine Corps camouflage fatigues and combat boots, and he still had his right hand

bandaged in a splint.  Some witnesses reported Richey was intoxicated.  Jeffrey Kezar recalled Richey saying, "If I can't have her [Candy], nobody else can."

Richey told several persons that Building "A" would burn that night and he would use his Marine training to do that. Robert Dannenberger described Richey as "very upset" and said Richey threatened to blow the place up since he had "learned how to do explosives" in the Marines.  Peggy Price became upset, and Richey told her, "Well, instead of blowing it up, I'll torch A Section."  Price recalled that Richey said, "Before the night is over, part of A Building is going to burn down."  Shirley Baker also recalls Richey saying, "A Building was going to burn * * *."  Juanita Altimus, while just outside her own apartment, overheard Richey say on the landing, "Building A was going to burn tonight."

By 2:00 a.m., the party was breaking up, and Richey kept asking Hope if he could spend the night on her sofa.  Hope refused.  Around 2:20 a.m., June 30, Richey offered to steal some flowers for Peggy from a greenhouse across the street, but Peggy told Richey not to bring them to her.

Between 3:00 and 3:30 a.m., Dennis Smith drove up and asked Hope to go with him.  Hope replied she did not have a baby-sitter, but Richey said, "Well, I'll keep an eye on her [Cynthia], if you'll let me sleep on your couch."  A neighbor also overheard Hope say to Richey, "Go upstairs with Scootie [Cynthia's nickname] -- she's asleep -- but don't lock the door because I can't get back in because I don't have a key."

Around 4:15 a.m., neighbors reported bright orange flames and smoke coming out of the Collins apartment, and the fire department responded.  Firemen saw several feet of flames from the apartment and deck curl up over the roof.  A resident and a fireman both started into the apartment, but the heat and fire were too intense.  A fireman then went back in, with oxygen, but he could not find Cynthia and soon ran out of oxygen.

Ultimately, several firemen, with fire hoses and oxygen masks, succeeded in removing Cynthia's body from her burning bedroom.  Cynthia died from asphyxia related to smoke inhalation.

When the firemen arrived, Richey was either at the Collins apartment or he arrived shortly thereafter; he was screaming that a child was still inside.  One fireman saw him coming out of the apartment, helped him up, and had to restrain him to keep him from going back in.  Richey was combative, argumentative, and interfered with efforts to fight the fire and rescue Cynthia.  Two deputy sheriffs overpowered Richey and turned him over to Police Chief Thomas Miller to keep him out of the way.

During the fire, Richey asked Nichols, "Why don't we finish it now, since you think you're so bad[?]"  Richey also asked Candy if the fire had scared her.  When she replied it had, Richey told her, "if he couldn't have me, that nobody would * * *."  Altimus reported that Richey, as he looked over the fire damage, drank a beer, laughed, and said, "It looks like I did a helluva good job, don't it."

Richey admitted that he had earlier gotten two plants from the K & J Greenhouse for Candy, and police found those plants outside Candy's apartment.  The K & J owner identified them as

having been stolen from his greenhouse.  Richey had also offered to steal two plants for Peggy that evening.  The K & J owner confirmed that paint thinner and gasoline were kept in two unlocked storage sheds.  Gasoline and paint thinner could have been stolen from these sheds; the owner did not know if any was missing.

Assistant State Fire Marshal Robert Cryer concluded from the physical evidence and burn patterns that an accelerant had been used.  An accelerant had been poured on the apartment's wooden deck, the fire's point of origin, as well as the living room rug.  A smoke detector had been pulled from the ceiling before the fire.  The fire was a very fast, hot, intense fire because of the accelerant.

Gregory DuBois, a consulting engineer, agreed that the fire had been caused by arson and that accelerants had been used.  One rug sample from the Collins apartment contained gasoline, and another rug sample revealed paint thinner.  Wood chips from that apartment's deck also contained paint thinner.  However, laboratory tests failed to reveal any accelerants on Richey's fatigues or boots.

Chief Miller interviewed Richey as a witness on the morning of June 30 and also obtained his statement in the afternoon after advising him of his rights.  By July 1, the investigation had focused on Richey, and police arrested Richey for arson and took further statements after advising him of his rights.  Police tape-recorded an interview of Richey on July 1.  Fire Marshal Cryer and Assistant Prosecuting Attorney Randy Bassinger participated in that interview.

In these statements, Richey maintained that he had been drunk on June 30 and did not remember much.  However, he denied starting the fire or knowing how it started.  He also denied that Hope had asked him to baby-sit Cynthia, and claimed that he had been at his father's apartment when the fire began.  Richey did admit that he knew Cynthia was in Hope's apartment; he had stopped and looked in on her while she was sleeping during the party.  Richey also claimed that he had secret ways with witnesses so they would not testify against him.  In a later statement, he said he would cut the prosecutor's throat.

A grand jury indicted Richey for aggravated murder with a specification alleging murder in the course of arson, aggravated arson, breaking and entering (the greenhouse), involuntary manslaughter, and child endangering.  A panel of three judges convicted Richey of all charges, save the manslaughter charge, which was dropped.  Following a presentence investigation, mental evaluation, and mitigation hearing, the panel sentenced Richey to death for aggravated murder and consecutive prison terms for the other offenses.  The court of appeals affirmed the convictions and sentence.

Daniel R. Gerschutz, Prosecuting Attorney, for appellee.
Randall M. Dana, Ohio Public Defender, Jane P. Perry and Kevin L. Fahey, for appellant.

Moyer, C.J.   We have reviewed appellant's twenty-three propositions of law, independently assessed the evidence relating to the death sentence, balanced the aggravating circumstance against the mitigating factors, and compared the

sentence to those imposed in similar cases.  As a result, we affirm the convictions and sentence of death.

I

Evidence of Threats

In his first proposition of law, Richey argues that admitting evidence of his threats destroyed the constitutionally required  reliability and fairness of his trial and sentence.  This evidence included the following.  Richey told Deputy Roy Sargent on November 19 that "Randy Bassinger [the prosecutor] was a dead man" and that "whoever testified against him had better hope he's six feet under."  On August 17, Richey told Deputy Mike Ball to take a message to Randy Bassinger, "that when he got out he was going to cut his throat."

While in pretrial confinement, Richey initiated conversations with his jailers about the offenses charged against him.  Richey's threats were simply part of those conversations.  Although Richey moved to suppress these statements, he did not object specifically to evidence of the threats.  Hence, the issue is waived except for plain error.  State v. Williams (1977), 51 Ohio St.2d 112, 5 O.O.3d 98, 364 N.E.2d 1364; State v. Long (1978), 53 Ohio St.2d 91, 7 O.O.3d 178, 372 N.E.2d 804.

Richey's threats reflect a consciousness of his guilt, similar to evidence of flight to avoid prosecution, or efforts made to cover up a crime or intimidate witnesses.  See State v. Eaton (1969), 19 Ohio St.2d 145, 48 O.O.2d 188, 249 N.E.2d 897 (flight from justice may indicate a consciousness of guilt); Cleveland v. McNea (1952), 158 Ohio St. 138, 142, 48 O.O. 68, 70, 107 N.E.2d 201, 203 (suppression of adverse evidence constitutes a prejudicial circumstance of much weight); State v. Huffman (1912), 86 Ohio St. 229, 99 N.E. 295; Moore v. State (1853), 2 Ohio St. 500; 2 McCormick on Evidence (4 Ed. 1992), Sections 263, 265; 2 Wigmore on Evidence (Chadbourn Rev. 1979 and 1991 Supp.), Sections 273, 276, and 278.

However, even if we were to find the evidence improper, no plain error is apparent.  The circumstantial evidence against Richey was compelling in view of his explicit threat that Building "A" would burn that night, his motive and opportunity to start the fire, and the other circumstances.  In State v. Bayless (1976), 48 Ohio St.2d 73, 106, 2 O.O.3d 249, 267, 357 N.E.2d 1035, 1056, vacated in part (1978), 438 U.S. 911, 98 S.Ct. 3135, 57 L.Ed.2d 1155, we found evidence about threats against deputies to be harmless error even though wrongfully admitted, over objection, in an aggravated murder prosecution.  Additionally, in a bench trial, the court must be presumed to have "'considered only the relevant, material, and competent evidence in arriving at its judgment unless it affirmatively appears to the contrary.'"  State v. Post (1987), 32 Ohio St.3d 380, 384, 513 N.E.2d 754, 759.

In Proposition of Law II, Richey argues that the judges of the panel, having been persuaded at the trial's outset that Richey was dangerous, should have disqualified themselves.  At the trial, the prosecutor moved that Richey's hands and feet be shackled.  However, the panel ordered Richey's feet shackled but left his hands free.

Admittedly, "no one should be tried while shackled, absent

unusual circumstances." State v. Kidder (1987), 32 Ohio St.3d 279, 285, 513 N.E.2d 311, 318. However, shackling is left to the trial court's sound discretion. State v. Woodards (1966), 6 Ohio St.2d 14, 23, 35 O.O.2d 8, 13, 215 N.E.2d 568, 576. In this case, defense counsel did not object to the shackling, and Richey had repeatedly threatened to kill the prosecutor and witnesses against him. Under the circumstances, we find no prejudicial error. Compare Woodards v. Cardwell (C.A.6, 1970), 430 F.2d 978, with Kennedy v. Cardwell (C.A.6, 1973), 487 F.2d 101; Annotation (1979 and 1991 Supp.), 90 A.L.R.3d 17. On its own motion, the court ruled that deputies could wear firearms and could search anyone entering the courtroom, but those orders reflected routine housekeeping functions. See R.C. 2945.03.

Even though the judges had been exposed to evidence about Richey's threats, they did not need to recuse themselves. Richey accepted the panel and raised this issue neither at trial nor before the court of appeals. Hence, we need not consider this issue. State v. Williams, supra; State v. Price (1979), 60 Ohio St.2d 136, 14 O.O.3d 379, 398 N.E.2d 772.

State v. Gillard (1988), 40 Ohio St.3d 226, 533 N.E.2d 272, is distinguishable. Gillard involved a ruling on ex parte evidence in a closed hearing under Crim. R. 16(B)(1)(e). Also, Gillard did not announce a per se prejudice rule. In this case, as in Gillard, the trial judges are presumed not to have improperly used the evidence about threats in their subsequent deliberations. State v. Post, supra. Nothing in the record indicates they did so, and the evidence of guilt is otherwise compelling. See discussion, Part V.

Since the evidence about Richey's threats was included in the report of the presentence investigation, it could be considered during sentence deliberations. Such evidence relates to an accused's "history, character, and background." R.C. 2929.04(B). Criminal wrongdoing, even without convictions, is part of an accused's social history and thus properly included in a presentence investigation report. State v. Cooey (1989), 46 Ohio St.3d 20, 35, 544 N.E.2d 895, 914; State v. Hutton (1990), 53 Ohio St.3d 36, 559 N.E.2d 432, paragraph one of the syllabus.

## II
### Presentence Investigation

In Proposition of Law III, Richey argues that the presentence investigation report ("PSI") erroneously included a letter he wrote. The trial court had earlier suppressed that letter as not relevant at the guilt or penalty phase.

While in pretrial custody, Richey wrote to a friend in Scotland that police in the United States did not scare him. The letter was quoted in the PSI as follows:

"If one ever pulls a gun on me he'd better shoot to kill. * * * Remember that day when I shot Gog's in the head with your gun, I laughed so hard I almost ripped my sides! [If the police in Scotland] ever found out about 1/2 the stuff we done they'd bring back the death penalty just for us! * * * If they just give me prison time they better hope to hell I die in there, cause when I get out I won't stop hunting them all down until everyone who is involved in this case is dead!"

Arguably that letter was relevant to the sentencing

decision.  A PSI is not limited by the strict rules of evidence.  See State v. Greer (1988), 39 Ohio St.3d 236, 254, 530 N.E.2d 382, 402-403.  This PSI related to Richey's "history, character, and background."  R.C. 2929.04(B); State v. Hutton, supra.

Moreover, having failed to object to the PSI, or the letter's inclusion in the PSI, Richey waived any issue related to the PSI except for plain error.  State v. Cooey, supra, at 35, 544 N.E.2d at 914; State v. Long, supra.  No plain error was involved since the court already knew Richey had threatened the prosecutor and the trial witnesses.  See Part I.  Hence, evidence of these additional threats made little difference and did not cause a miscarriage of justice.

### III
### Other Evidence Issues

In his fourth proposition of law, Richey argues that his rights to a fair trial and effective counsel were violated when the prosecutor called a defense-retained expert as a state witness.  Dubois, a consulting engineer, agreed with the State Fire Marshal's opinion that accelerants had been used in the fire.

The right to the effective assistance of counsel includes access to defense experts, and the state's use of such witnesses could infringe an accused's attorney-client privilege.  See Miller v. Dist. Ct. of Denver (Colo. 1987), 737 P.2d 834; State v. Mingo (1978), 77 N.J. 576, 392 A.2d 590; but, see, Noggle v. Marshall (C.A.6, 1983), 706 F.2d 1408; Granviel v. Estelle (C.A.5, 1981), 655 F.2d 673; State v. Pawlyk (1990), 115 Wash.2d 457, 800 P.2d 338.

The prosecutor's use of a defense expert does not violate an accused's Sixth Amendment right to counsel.  Noggle, supra. Although the prosecutor's use of a defense expert may violate an accused's attorney-client privilege, Dubois did not disclose or rely upon any confidential communications here.  Instead, Dubois based his testimony upon the physical evidence, reports, and photographs of the fire.

By not objecting, Richey waived any attorney-client privilege as to Dubois.  Moreover, no plain error exists; no manifest miscarriage of justice occurred because Dubois's testimony made no difference.  The Fire Marshal's testimony that the fire had been caused by arson and accelerants was not otherwise contradicted.  In such cases, the record must reflect prejudice before reversal is required.  See Hutchinson v. People (Colo. 1987), 742 P.2d 875, 886; United States v. Talley (C.A.9, 1986), 790 F.2d 1468; State v. Mingo, 77 N.J. at 588, 392 A.2d at 596.

In Proposition of Law VI, Richey argues that the admission of the Collins carpet into evidence violated his rights because the physical integrity of the carpet had been compromised.  Two deputy sheriffs recovered the Collins carpet from a trash dump on July 1, where it had been taken, unknown to investigators, after the fire.  Two samples from this carpet revealed the presence of gasoline and paint thinner.

The evidence firmly established that the carpet admitted into evidence was the carpet from the Collins apartment. Authentication "is satisfied by evidence sufficient to support a finding that the matter in question is what its proponent

claims." Evid. R. 901(A). The possibility of contamination goes to the weight of the evidence, not its admissibility. "A strict chain of custody is not always required in order for physical evidence to be admissible." State v. Wilkins (1980), 64 Ohio St.2d 382, 389, 18 O.O.3d 528, 532, 415 N.E.2d 303, 308; see State v. Downs (1977), 51 Ohio St.2d 47, 63, 5 O.O.3d 30, 38, 364 N.E.2d 1140, 1150.

Moreover, other evidence established that the arsonist had used accelerants, including dominant pour patterns to the burning on the wood deck and living room concrete. An accelerant was also found in wood chips from the deck floor. Thus, even if the rug had been wrongfully admitted, other evidence of arson rendered any error harmless. Crim.R. 52(A).

In Proposition of Law IX, Richey argues that evidence of his pretrial statements violated his Miranda rights and Sixth Amendment right to counsel. Richey made several statements to police about the fire, denying any culpability. In one statement, Richey admitted he had broken into a greenhouse across the street and stolen some potted plants. The trial court denied Richey's motion to suppress, finding no constitutional violations.

Richey complains first about admission of a statement he made to Police Chief Miller on the morning of the fire. However, Miller initially interviewed Richey only as a possible witness to the fire, and Richey was not under arrest or in custody. Richey was free to leave as long as he stayed out of the fire fighters' way. Since no custodial interrogation occurred, Miller was not required to inform Richey of his constitutional rights. See Oregon v. Mathiason (1977), 429 U.S. 492, 97 S.Ct. 711, 50 L.Ed.2d 714; Minnesota v. Murphy (1984), 465 U.S. 420, 104 S.Ct. 1136, 79 L.Ed.2d 409.

Even if a custodial interrogation occurred, any error would be harmless beyond a reasonable doubt. In this brief June 30 statement, Richey said nothing about how the fire started, and the statement could not have harmed him before the trier of fact.

Around noon, Miller interviewed Richey again, but Miller then advised him of his Miranda rights before securing a second statement. On July 1, Richey was advised of his rights twice when he was arrested.

Richey further complains that his Sixth Amendment rights were violated by evidence about conversations he had while in pretrial confinement. On August 17, 1986, Richey threatened the prosecutor in a conversation with Deputy Mike Ball. On November 19, Richey made further threats against the prosecutor and witnesses in a conversation with Deputy Roy Sergeant. In neither case did the deputies initiate the conversation or question Richey.

The Miranda safeguards do not preclude admission of this evidence because Richey initiated the conversations and also waived his right to have a lawyer present. Hence, the trial court did not err in declining to suppress Richey's statements. See Rhode Island v. Innis (1980), 446 U.S. 291, 100 S.Ct. 1682, 64 L.Ed.2d 297; Oregon v. Bradshaw (1983), 462 U.S. 1039, 103 S.Ct. 2830, 77 L.Ed.2d 405; Connecticut v. Barrett (1987), 479 U.S. 523, 107 S.Ct. 828, 93 L.Ed.2d 920.

IV

                  Prosecutorial Misconduct

    In Proposition of Law V, Richey argues that the prosecutor
grievously erred in his final guilt-phase argument.  However,
"the touchstone of due process analysis in cases of alleged
prosecutorial misconduct is the fairness of the trial, not the
culpability of the prosecutor."  Smith v. Phillips (1982), 455
U.S. 209, 219, 102 S.Ct. 940, 947, 71 L.Ed.2d 78, 87.  Accord
State v. DePew (1988), 38 Ohio St.3d 275, 288, 528 N.E.2d 542,
556-557; State v. Johnson (1989), 46 Ohio St.3d 96, 102, 545
N.E.2d 636, 642.  Moreover, in a bench trial, trial judges are
presumed to rely only upon relevant, material, and competent
evidence, in arriving at their judgments.  State v. Post,
supra, 32 Ohio St.3d at 384, 513 N.E.2d at 759.

    The prosecutor did not commit crucial errors.  The
prosecutor's reference to Richey as a sociopath or psychopath
was a fair inference based on the evidence.  In any event, it
was not prejudicial before a panel of judges.  State v. Post,
supra.  The prosecutor's varied comments about why accelerants
had not shown up on Richey's clothing also constituted fair
comment.  Prosecutors are entitled to latitude as to what the
evidence has shown and what inferences can be drawn therefrom.
State v. Stephens (1970), 24 Ohio St.2d 76, 82, 53 O.O.2d 182,
185, 263 N.E.2d 773, 777; see State v. Byrd (1987), 32 Ohio
St.3d 79, 82, 512 N.E.2d 611, 616.

    By referring to Richey's threats, the prosecutor referred
to evidence in the record admitted without objection.  The
prosecutor's reference to the helpless victim, who was in a
hopeless situation from which she could not escape, was brief
and not prejudicial.  See Payne v. Tennessee (1991), 501
U.S.    , 111 S.Ct. 2597, 115 L.Ed.2d 720.  Thus, Proposition
of Law V is overruled.
                              V
                  Sufficiency of Evidence
    In Proposition of Law VII, Richey argues that the
circumstantial evidence at trial did not establish his identity
as the arsonist and killer of Cynthia Collins.  Richey argues
the evidence is insufficient because testing failed to show
accelerants on his clothing.  However, Richey may not have
spilled any gasoline or paint thinner on his clothing when he
set the fire, or at least not on portions of the clothing
eventually tested.  Alternatively, the fatigues seized by the
police on July 1 may not have been those worn by Richey on June
29-30.

    Richey challenges the accuracy of the times that Altimus
gave for statements she heard.  However, Altimus may have been
simply confused about when she heard Richey.  Richey argues
that he could not have set the fire because he was intoxicated
and had a splint on his hand.  However, he could still use that
bandaged hand, and the evidence about his intoxication was
conflicting.

    In a review for sufficiency, the evidence must be
considered in a light most favorable to the prosecution.
Jackson v. Virginia (1979), 443 U.S. 307, 99 S.Ct. 2781, 61
L.Ed.2d 560; State v. Davis (1988), 38 Ohio St.3d 361, 365, 528
N.E.2d 925, 930.  "* * * [T]he weight to be given the evidence
and the credibility of the witnesses are primarily for the
trier of the facts."  State v. DeHass (1967), 10 Ohio St.2d

230, 39 O.O.2d 366, 227 N.E.2d 212, paragraph one of the syllabus. Murder convictions can rest upon circumstantial evidence. State v. Nicely (1988), 39 Ohio St.3d 147, 150, 529 N.E.2d 1236, 1239; State v. Apanovitch (1987), 33 Ohio St.3d 19, 27, 514 N.E.2d 394, 402. Indeed, circumstantial evidence may be more certain, satisfying and persuasive than direct evidence. State v. Lott (1990), 51 Ohio St.3d 160, 167, 555 N.E.2d 293, 302. Accord State v. Jenks (1991), 61 Ohio St.3d 259, 574 N.E.2d 492.

The evidence against Richey established that he was the killer and arsonist. Five days before the fire, Richey pulled a knife on Butler, who had just been in bed with Candy, and Richey had told Candy he would kill any new boyfriend she found. At the party, Richey was infuriated because Candy brought Nichols, kissed him repeatedly, and asked Nichols to spend the night with her. Dannenberger, Price, and Altimus all heard Richey say that Building "A" would burn that night, which Richey said more than once. The fire started three hours later.

The evidence shows that Hope Collins gave Richey access to her apartment and asked Richey to baby-sit Cynthia, and he agreed to do so. Moreover, Richey admitted to the police that he knew Cynthia was in her bedroom, since he had stopped to see her there during the party. Less than an hour after agreeing to baby-sit for her, Richey started the fire in Hope's apartment. Candy's apartment was immediately below Hope's apartment, and the latter's smoke detector had been ripped out of the ceiling and was hanging by the wires. Damage to the smoke detector may have delayed any warning about the fire.

Unrebutted expert witnesses asserted that the fire had been deliberately started, and that gasoline and paint thinner had been used as accelerants. Richey had access to a greenhouse where gasoline and paint thinner were stored; some of the gasoline and paint thinner could have been missing; and Richey admittedly had stolen plants from that greenhouse. Additionally, during the fire, Richey continued to challenge Nichols to a fight and reasserted to Candy that he would not let anyone else have her. To Altimus, the elderly neighbor, Richey bragged that he had done "a helluva good job" as he laughed and surveyed the fire damage.

The evidence also established Richey's intention to kill Candy and Nichols. Before the fire, Richey threatened Candy and any new boyfriend she would acquire. At the party, Richey specifically threatened to burn Building "A." He then set the fire in a jealous rage directed at Candy and her new boyfriend. "It is a fundamental principle that a person is presumed to intend the natural, reasonable and probable consequences of his voluntary acts." State v. Johnson (1978), 56 Ohio St.2d 35, 39, 10 O.O.3d 78, 80, 381 N.E.2d 637, 640; State v. Lott, supra, at 168, 555 N.E.2d at 302.

The fact that the intended victims escaped harm, and that an innocent child, Cynthia Collins, was killed instead, does not alter Richey's legal and moral responsibility. "The doctrine of transferred intent is firmly rooted in Ohio law." State v. Sowell (1988), 39 Ohio St.3d 322, 332, 530 N.E.2d 1294, 1305. Very simply, "the culpability of a scheme designed to implement the calculated decision to kill is not altered by the fact that the scheme is directed at someone other than the

actual victim."  State v. Solomon (1981), 66 Ohio St.2d 214, 218, 20 O.O. 3d 213, 216, 421 N.E.2d 139, 142.

Other states agree.  Aside from a few states whose statutes require a different result, "there is a singular unanimity among the decisions in the overwhelming majority of the states that such a homicide 'partakes of the quality of the original act, so that the guilt of the perpetrator of the crime is exactly what it would have been had the blow fallen upon the intended victim instead of the bystander.'"  Gladden v. State (1974), 273 Md. 383, 392, 330 A.2d 176, 181.  Accord State v. Julius (1991), 185 W.Va. 422, 408 S.E.2d 1, and cases cited in Gladden and Julius.

In Wareham v. State (1874), 25 Ohio St. 601, 607, this court explained the reasons for this principle:  "The purpose and malice with which the blow was struck is not changed in any degree by the circumstance that it did not take effect upon the person at whom it was aimed.  The purpose and malice remain, and if the person struck is killed, the crime is as complete as though the person against whom the blow was directed had been killed, the lives of all persons being equally sacred in the eye of the law, and equally protected by its provisions."

A verdict will not be reversed "where there is substantial evidence upon which a jury could reasonably conclude that all the elements of an offense have been proven beyond a reasonable doubt."  State v. Eley (1978), 56 Ohio St.2d 169, 10 O.O.3d 340, 383 N.E.2d 132, syllabus.  In this case, substantial evidence existed to sustain all the elements of the offenses charged, and the panel's verdict stands.

VI

Miscellaneous Guilt Phase Issues

In Proposition of Law VIII, Richey argues that the trial court failed to minimize the risk of collusion among witnesses and that, hence, the guilty verdict was not reliable.  At the trial, the court granted Richey's motion to separate witnesses in accordance with Evid. R. 615.  Richey also asked that witnesses be sequestered from each other and admonished not to discuss their testimony after they testified.  The trial court denied that motion, ruling that possible discussion among witnesses could be tested on cross-examination.

R.C. 2945.03 specifies the right of a trial judge in a criminal trial to control the trial proceedings.  Orders relating to witnesses are entrusted to the sound discretion of the trial court.

At trial, Richey failed to demonstrate any need for the measures he requested.  Richey could question witnesses during cross-examination about any prior discussions.  Richey also fails to cite specific instances of preventable discussions, or any prejudice from the lack of such orders, or any authority requiring such orders.  Thus, Proposition of Law VIII lacks merit.

In Proposition of Law X, Richey argues that the trial court erred by not severing count three, the break-in at the K & J Greenhouse, from the other offenses.  Richey argues that this offense was not related to the arson.  However, the law favors joining multiple offenses in a single trial under Crim.R. 8(A).  See State v. Lott, supra, at 163, 555 N.E.2d at 298; State v. Torres (1981), 66 Ohio St.2d 340, 343, 20 O.O.3d

313, 315, 421 N.E.2d 1288, 1290.  The K & J break-in was an integral part of the arson and thus part of "a common scheme or plan" or "a course of criminal conduct" under Crim.R. 8(A). Richey broke into the K & J Greenhouse, located across the street from the apartment complex, in the hours before the arson.  Moreover, the break-in explained Richey's access to gasoline and paint thinner, which other evidence demonstrated were the accelerants used in the arson.

Even though joinder was possible, Richey argues that the trial court should have severed count three from the others under Crim.R. 14.  However, Richey has the burden to establish prejudice to his rights in accordance with Crim.R. 14.  State v. Torres, supra, syllabus; State v. Lott, supra, at 163, 555 N.E.2d at 298; State v. Roberts (1980), 62 Ohio St.2d 170, 175, 16 O.O.3d 201, 204, 405 N.E.2d 247, 251.

Richey failed to establish prejudice.  Evidence of the joined crime, the break-in, was simple and direct and thus not possibly confusing.  See State v. Lott, supra, at 163, 555 N.E.2d at 298; State v. Franklin (1991), 62 Ohio St.3d 118, 122, 580 N.E.2d 1, 6.  Moreover, the panel of judges could not have confused the separate offenses.  State v. Lott, supra, at 164, 555 N.E.2d at 298.

Additionally, evidence of that break-in would have been admissible, under Evid.R. 404(B), even if that offense had not been joined.  Proof that Richey broke into the greenhouse established that he had the opportunity to discover and steal the paint thinner and gasoline stored there.  Access to these accelerants was also part of his preparation to burn Building "A."  See State v. Jamison (1990), 49 Ohio St.3d 182, 552 N.E.2d 180; State v. Broom (1988), 40 Ohio St.3d 277, 282, 533 N.E.2d 682, 690.  Proposition of Law X lacks merit.

In Proposition of Law XIII, Richey argues that the state's failure to record grand jury testimony violated his due process and fair trial rights, necessitating reversal.  Richey correctly points out that "[p]ursuant to Crim. R. 22 grand jury proceedings in felony cases must be recorded."  State v. Grewell (1989), 45 Ohio St.3d 4, 543 N.E.2d 93, syllabus.

At trial, Richey expressed an interest in grand jury testimony only to avoid unnecessary voir dire of jurors. Richey subsequently waived a jury trial and therefore abandoned this basis for that request.  On appeal, Richey asserts for the first time that he needed the transcripts to explore possible inconsistent statements by witnesses.  However, Richey established no basis at trial for any particularized need, and his general assertions do not establish particularized need now.  "Grand jury proceedings are secret, and an accused is not entitled to inspect grand jury transcripts * * * unless the ends of justice require it and there is a showing by the defense that a particularized need for disclosure exists * * *." State v. Greer (1981), 66 Ohio St.2d 139, 20 O.O.3d 157, 420 N.E.2d 982, paragraph two of the syllabus.

Therefore, Richey was not entitled to the transcripts, even if they existed.  The error in failing to record the testimony is harmless.  See State v. Grewell, supra, at 9, 543 N.E.2d at 98; State v. Wickline (1990), 50 Ohio St.3d 114, 122, 552 N.E. 2d 913, 922.

In Proposition of Law XIV, Richey argues for reversal

because the trial court failed to state essential findings under Crim.R. 12(E) when it denied Richey's motions to suppress his pretrial statements. However, Crim.R. 12(E) does not control because Richey did not request factual findings. "[I]n order to invoke the rule, the defendant must request that the court state its essential findings of fact in support of its denial of a motion." State v. Benner (1988), 40 Ohio St.3d 301, 317, 533 N.E.2d 701, 718; see Bryan v. Knapp (1986), 21 Ohio St.3d 64, 21 OBR 363, 488 N.E.2d 142. Moreover, the evidence necessitated the trial court's decision not to suppress the statements. Any error would be harmless. See Part III.

In Proposition of Law XVI, Richey argues that his rights to a complete record, the effective assistance of counsel, and meaningful appellate review were compromised because the visit to the crime scene was unrecorded. However, the trial court asked counsel before the visit, "Do you have any problem waiving the presence of the court reporter?" The prosecutor said he did not, and defense counsel said nothing. At trial, neither counsel asked the court to describe the visit.

R.C. 2945.16 authorizes a view of a crime scene, and the trial court is vested with broad discretion in such matters. State v. Zuern (1987), 32 Ohio St.3d 56, 58, 512 N.E.2d 585, 588. A view of a crime scene is neither evidence nor a crucial stage in the proceedings. See State v. Tyler (1990), 50 Ohio St.3d 24, 38, 553 N.E.2d 576, 593; Snyder v. Massachusetts (1934), 291 U.S. 97, 108-109, 54 S.Ct. 330, 333, 78 L.Ed. 674, 679-680. The trial panel must be presumed to know and apply that principle. State v. Post, supra. Furthermore, Richey has not supplemented the record, pursuant to App.R. 9(C) or 9(E), in an effort to show prejudice from the lack of recording. The court cannot presume prejudice from an unrecorded visit to a crime scene. State v. Watson (1991), 61 Ohio St.3d 1, 15, 572 N.E.2d 97, 109; State v. Tyler, supra, at 38, 553 N.E.2d at 593.

VII

Ineffective Assistance of Counsel

In Proposition of Law XV, Richey argues that his counsel ineffectively represented him, thereby depriving him of his Sixth Amendment rights. Reversal on this ground requires that the defendant show, first, "that counsel's performance was deficient" and, second, "that the deficient performance prejudiced the defense" so as to deprive the defendant of a fair trial. Strickland v. Washington (1984), 466 U.S. 668, 687, 104 S.Ct. 2052, 2064, 80 L.Ed.2d 674, 693.

Richey complains first that his counsel failed to object to evidence about his threats to the prosecutor and witnesses. However, this evidence was arguably admissible and, in any event, made no difference at trial. See Part I. Richey also complains that his counsel did not attempt to disqualify the trial panel. However, counsel's tactical choice not to do so was within the range of professional discretion and cannot be second-guessed on appeal. His counsel could also properly choose not to object to the presentence report. See Strickland, supra, at 689, 104 S.Ct. at 2065, 80 L.Ed.2d at 694.

The prosecution's use of the defense's arson expert as a state witness made no difference in view of the uncontradicted evidence of arson and accelerants. Counsel had moved to

suppress Richey's pretrial statements, and did not fail in any essential duty by not asking for findings under Crim.R. 12(E), since those statements were properly admitted into evidence. The trial court properly sentenced Richey on different counts; hence, his counsel did not perform deficiently by not objecting to the imposed sentences.

In sum, Richey's counsel continued to function as the "counsel" guaranteed him by the Sixth Amendment. Moreover, no reasonable probability existed "that, were it not for counsel's errors, the result of the trial would have been different." State v. Bradley (1989), 42 Ohio St.3d 136, 538 N.E.2d 373, paragraph three of the syllabus. The prosecution had a strong case against Richey.

## VIII
### Constitutionality

We have previously rejected Richey's constitutional challenges in Propositions of Law XX and XXI to Ohio's proportionality review. See State v. Jenkins (1984), 15 Ohio St.3d 164, 176, 15 OBR 311, 321, 473 N.E.2d 264, 278; State v. Steffen (1987), 31 Ohio St.3d 111, 31 OBR 273, 509 N.E.2d 383, paragraph one of the syllabus. Despite Richey's claims in Proposition of Law XXII, Ohio's felony-murder statute is constitutional. See State v. Henderson (1988), 39 Ohio St.3d 24, 528 N.E.2d 1237, paragraph one of the syllabus. Despite Richey's claims in Proposition of Law XXIII, Ohio's law meets constitutional requirements for death penalty statutes. State v. Combs (1991), 62 Ohio St.3d 278, 291, 581 N.E.2d 1071, 1082; State v. Steffen, supra, 31 Ohio St.3d at 125, 31 OBR at 285, 509 N.E.2d at 396; State v. Maurer (1984), 15 Ohio St.3d 239, 15 OBR 379, 473 N.E.2d 768.

## IX
### Sentencing Errors

In Proposition of Law XI, Richey argues that imposing separate sentences for aggravated arson and aggravated murder violates R.C. 2941.25 and constitutional guarantees. In Proposition of Law XII, Richey pursues these same arguments in seeking to overturn separate sentences imposed for aggravated murder and endangeringa child.

State v. Blankenship (1988), 38 Ohio St.3d 116, 117, 526 N.E.2d 816, 817, noted:

"This court has set forth a two-tiered test to determine whether two crimes with which a defendant is charged are allied offenses of similar import. In the first step, the elements of the two crimes are compared. * * * In the second step, the defendant's conduct is reviewed to determine whether the defendant can be convicted of both offenses." (Emphasis sic.) See, also, State v. Mitchell (1983), 6 Ohio St.3d 416, 418, 6 OBR 463, 464, 453 N.E.2d 593, 594; State v. Logan (1979), 60 Ohio St.2d 126, 128, 14 O.O.3d 373, 374, 397 N.E.2d 1345, 1348.

When the elements are compared, aggravated murder and aggravated arson are not allied offenses of similar import within the meaning of R.C. 2941.25. Aggravated murder requires purposefully causing the death of another while committing one of nine specified felonies, of which aggravated arson is only one. Moreover, aggravated arson does not require a purposeful killing; instead, it requires a substantial risk of physical harm by fire or explosion. Thus, "[t]he two offenses are not

prerequisites, one for the other.  To consummate either offense, the other need not by definition be committed."  State v. Moss (1982), 69 Ohio St.2d 515, 520, 23 O.O.3d 447, 450, 433 N.E.2d 181, 186.  See, also, State v. Bickerstaff (1984), 10 Ohio St.3d 62, 10 OBR 352, 461 N.E.2d 892; State v. Willey (1981), 5 Ohio App.3d 86, 5 OBR 200, 449 N.E.2d 471 (aggravated arson and involuntary manslaughter are separately punishable).

Richey's Proposition of Law XII also lacks merit.  Child endangering under R.C. 2919.22(A) and aggravated murder are not allied offenses of similar import.  The elements of child endangering are the defendant's custody or control of a child under eighteen and his creation of a substantial risk to the health or safety of the child by violating a duty of care or protection.  Aggravated murder is a purposeful killing in the course of one of nine specified felonies, none of which is child endangering.  These offenses have entirely different elements.  Cf. State v. Anderson (1984), 16 Ohio App.3d 251, 16 OBR 275, 475 N.E.2d 492 (child endangering and felonious assault are not allied offenses of similar import).

In Proposition of Law XVII, Richey complains the trial court erred in not giving any weight to relevant mitigation evidence. In Proposition of Law XIX, Richey argues the court of appeals failed to individually consider his particular character and family background.

Richey presented a variety of evidence concerning his personal history, character and background.  Also, several mental health professionals concluded that Richey suffered from borderline and antisocial personality disorders.  Richey reasons that this evidence was strongly mitigating and that the trial court and court of appeals erred by imposing a death sentence.

Contrary to Richey's claims, courts need not give weight to relevant mitigation evidence simply because they must consider such evidence under Supreme Court precedents.  See Eddings v. Oklahoma (1982), 455 U.S. 104, 102 S.Ct. 869, 71 L.Ed.2d 1; Skipper v. South Carolina (1986), 476 U.S. 1, 106 S.Ct. 1669, 90 L.Ed.2d 1.  What weight to be given mitigation evidence is necessarily an individual decision by the fact finder.  "* * * The fact that an item of evidence is admissible under R.C. 2929.04(B)(7) does not automatically mean that it must be given any weight."  State v. Steffen, supra, paragraph two of the syllabus.  See, also, State v. Stumpf (1987), 32 Ohio St.3d 95, 512 N.E.2d 598, paragraph two of the syllabus.

At times, we have assigned little or no weight to evidence of personality disorders or family background; hence, the trial court did not err when declining to give those factors any weight.  See State v. Cooey, supra, at 41, 544 N.E.2d at 919; State v. Van Hook (1988), 39 Ohio St.3d 256, 263, 530 N.E.2d 883, 889-890.

Richey's Proposition of Law XIX also lacks merit.  The court of appeals did not err when it referred to millions of persons with backgrounds similar to Richey's.  By so doing, the court simply reflected its view that his family background was not mitigating.  We have used similar reasoning.  See State v. Dickerson (1989), 45 Ohio St.3d 206, 218, 543 N.E.2d 1250, 1261; State v. Broom, supra, at 294, 533 N.E.2d at 701.

The court of appeals' written opinion demonstrates that

the court performed its constitutional obligation of giving "individualized consideration" to the appropriate penalty for Richey.  Lockett v. Ohio (1978), 438 U.S. 586, 605, 98 S.Ct. 2954, 2965, 57 L.Ed.2d 973, 990; Eddings v. Oklahoma (1982), 455 U.S. 104, 102 S.Ct. 869, 71 L.Ed.2d 1.  Moreover, our independent evaluation of the evidence cures any sentencing errors by the trial court or the court of appeals.  See Clemons v. Mississippi (1990), 494 U.S. 738, 110 S.Ct. 1441, 108 L.Ed.2d 725; State v. Lott, supra; State v. Landrum (1990), 53 Ohio St.3d 107, 559 N.E.2d 710.

X

Sentence Evaluation

In Proposition of Law XVIII, Richey argues that his death sentence was inappropriate based upon residual doubt, the admission of irrelevant evidence of threats, and overwhelming mitigation evidence.  Richey does not dispute, and we find, that the aggravating circumstance, that the murder occurred during an aggravated arson, was proved beyond a reasonable doubt.

Richey presented extensive mitigating evidence that he suffered "borderline" and "antisocial" personality disorders.  According to Dr. Leena Puhakka, a psychologist, Richey displayed classic symptoms of those personality disorders.  Dr. Puhakka found Richey functioned at the emotional level of a ten- or eleven-year-old.  Dr. Antoine Demosthene, a psychiatrist, found no evidence of psychosis or mental disease, although Richey was very socially maladjusted, and suffered antisocial personality disorder.

Dr. William McIntosh, a psychologist, testified that Richey frequently lied to manipulate the results of mental evaluations.  He stated that Richey had come from a chaotic family background, had an early history of violence and drug abuse, and displayed erratic behavior and poor impulse control.  Although not psychotic, Richey did have mental disorders, according to Dr. McIntosh.

Dr. Thomas Sherman, a board-certified psychiatrist testifying by deposition for the state, found Richey "extremely impulsive, self-centered, hedonistic."  He stated that Richey did not display any psychosis or inability to understand the criminality of his acts or to refrain from those acts.

Evidence by psychiatrists and psychologists also revealed Richey's preoccupation with death, blood, and violence, and his acts of self-mutilation and attempts at suicide resulting in over six hundred self-imposed scars and cuts on his body.  Richey received his first mental health evaluation in January 1978, when thirteen years old, and has been briefly treated and evaluated for erratic behavior in various mental institutions.

Social worker Judith Tolliver described Richey as a blustering young man who suffered from a "histrionic behavior disorder" in addition to his other personality disorders.  She found Richey not delusional, mentally impaired or actively psychotic but severely and chronically maladjusted.

Richey was born in Holland in August 1964, where his father was stationed as a member of the United States Armed Forces.  His mother was Scottish.  Richey was raised mostly in Scotland, where his parents lived.  As a teenage boy in Scotland, Richey was arrested several times for fighting,

larceny, and breaking and entering. Richey came to the United States in 1982 and worked for his father, and he also travelled to different cities and worked at different jobs. In 1984, Richey joined the Marine Corps, and he served for fourteen months before being honorably discharged. Richey also was married in Minnesota and fathered a son, but afterwards his wife divorced him.

Our independent assessment of the evidence reveals some mitigating features in Richey's history and background. Richey's mother abused alcohol and taught him to resent authority. Richey suffers from lifelong borderline and antisocial personality disorders. Richey also served more than a year in the United States Marine Corps and was honorably discharged. All of these factors are entitled to some mitigating weight. Otherwise, little else in Richey's history, character, or background is mitigating. Although Richey abused alcohol and drugs, nothing suggests a serious drug addiction. On balance, his history, character and background do not offer substantial mitigating features.

Nothing in the nature and circumstances of the offense offers any mitigating features. Richey killed a defenseless child, whose safety had been entrusted to him, as a result of a blind, jealous rage directed at his ex-girlfriend and her current lover. The fact that he killed an unintended victim rather than the intended victims does not alter his moral culpability under the firmly established doctrine of transferred intent. State v. Solomon; Wareham v. State, both supra. His ostensible efforts to save Cynthia did not help her and interfered with firemen's efforts to rescue her and fight the fire. Under the circumstances, nothing in the facts of the offense is mitigating.

The murder victim did not induce or facilitate the offense nor was Richey under "duress, coercion, or strong provocation"; hence, R.C. 2929.04(B)(1) and (B)(2) do not apply. Richey did not suffer, at the time of the offense, from a "mental disease or defect"; therefore, R.C. 2929.04(B)(3) did not apply. A behavior or personality disorder does not qualify as a mental defect or disease. State v. Cooey; State v. Van Hook, supra. Richey's age of twenty-one when he committed the offenses is a relevant statutory mitigating factor entitled to weight under R.C. 2929.04(B)(4). Richey's prior adjudications as a juvenile offender and his adult record of arrests and convictions preclude finding the lack of a record as a mitigating factor. See R.C. 2929.04(B)(5). The evidence shows that Richey was the only actor in these crimes; hence, R.C. 2929.04(B)(6) does not apply.

Richey suggests residual doubt as an "other factor," R.C. 2929.04(B)(7). Depending upon the facts, residual doubt can be a mitigating factor. State v. Watson, supra. However, the strong evidence of guilt in this case precludes awarding residual doubt any mitigating value.

Richey also argues that the admission of irrelevant evidence that he threatened the prosecutor and witnesses showed the unfairness of the trial and rendered the death penalty inappropriate. However, such evidence related to his "history, character, and background," R.C. 2929.04(B), and thus was relevant to the death penalty determination. Richey's

background and his personality disorders are relevant under R.C. 2929.04(B)(7), but their impact has already been considered as part of his background and history. No other mitigation appears relevant as "other factors" under R.C. 2929.04(B)(7).

Despite this mitigation evidence, the aggravating circumstance outweighs any mitigating factors. In torching an apartment building at night, he jeopardized the lives of others in addition to killing an innocent two-year-old child. Applicable mitigating factors are of little weight when compared to the aggravating circumstance proved against him. His personality disorders did not rise to the level of substantial impairment of capacity under R.C. 2929.04(B)(3). Many criminals have personality disorders. Thus, his background did not contain any substantial mitigating features.

The death penalty is appropriate and proportionate when compared with similar felony murder cases. See State v. Bonnell (1991), 61 Ohio St.3d 179, 573 N.E.2d 1082 (felony murder); State v. Lott, supra (felony murder, victim set on fire); State v. Seiber (1990), 56 Ohio St.3d 4, 564 N.E.2d 408 (felony murder); State v. Powell (1990), 49 Ohio St.3d 255, 552 N.E.2d 191 (felony murder, seven-year-old victim); State v. DePew, supra (felony murder including arson, three victims including a seven-year-old); State v. Morales (1987), 32 Ohio St.3d 252, 513 N.E.2d 267 (felony murder, twelve-year-old victim); State v. Buell (1986), 22 Ohio St.3d 124, 22 OBR 203, 489 N.E.2d 795 (felony murder, eleven-year-old victim); State v. Maurer, supra (felony murder, seven-year-old victim).

Accordingly, we affirm the convictions and sentence, including the death penalty.

Judgment affirmed.

Holmes, Douglas and Resnick, JJ., concur.

Sweeney, Wright and H. Brown, JJ., dissent.

Herbert R. Brown, J. I must respectfully dissent. For the reasons set forth below, I would overturn the sentence of death.

R.C. 2929.05 requires us to undertake a three-part analysis: the court must review proposed errors, weigh aggravating circumstances against mitigating factors, and compare the sentence to those imposed in similar cases. I disagree with all three parts of the majority's analysis.

I

Mitigation

The majority asserts that "[n]othing in the nature and circumstances of the offense offers any mitigating features." This statement is shocking, in view of the fact that Richey actively tried to save Cynthia Collins. His efforts were not "ostensible," as characterized by the majority; Richey put his own life in danger by physically being in the burning apartment. He repeatedly and hysterically told the firemen and anyone else nearby: "there's a baby in there." He also told the firemen where Cynthia was in the apartment. The majority cruelly misconstrues the evidence when it asserts that the defendant's efforts interfered with those of the firemen. The defendant was overwrought in his concern for the child. While there is some evidence that his presence (because he was overwrought) was not helpful, this is in no sense contradictory

to the fact that defendant's desire was to save the child. Further, the officials clearly identified in the record as physically restraining Richey and keeping him away from the apartment were special deputies and a police officer in civilian clothing. These people would not and could not have directly fought the fire or rescued Cynthia.

In addition, no evidence of any animus toward Cynthia was presented. In fact, the prosecutor admitted in oral argument before this court that there was no evidence that Richey had any intent to kill Cynthia. Chief of Police Miller testified that Richey was concerned about Cynthia, and special agent Chandler testified that Richey repeatedly asked about Cynthia while the fire was being put out. Richey's rescue attempt and the fact that the victim was unintended are strong mitigating factors that should have been considered in this case. When these factors are considered, the balance shifts against the death penalty.

## II
## Claims of Error

The majority dismisses several of the defendant's propositions of law without real analysis of the issues.

### A
### Evidence of Threats

Several of defendant's propositions of law deal with evidence that he made threats against the prosecutor and potential witnesses while in custody. The majority first contends that the issue of admissibility of these threats is waived. Richey did move to suppress the statements, and the fact that he did not specifically object to their admissibility does not automatically mean they are waived. "* * * [A]n appellate court need not consider an error which a party complaining of the trial court's judgment could have called, but did not call, to the trial court's attention at a time when such error could have been avoided * * *." State v. Williams (1977), 51 Ohio St.2d 112, 117, 5 O.O.3d 98, 101, 364 N.E.2d 1364, 1367. Richey brought this error to the trial court's attention by the motion to suppress, and thus there is no waiver. See, generally, State v. Long (1978), 53 Ohio St.2d 91, 7 O.O.3d 178, 372 N.E.2d 804.

The majority also contends that Richey's threats "reflect a consciousness of his guilt," and should therefore be admissible. It is by no means clear that this is so. A person wrongly accused could easily take out his frustration and anger in this fashion. In particular, Richey's anti-social and borderline personality traits might make the urge to lash out from a false accusation stronger. In any case, jailhouse threats are of a different order than flight from prosecution or a coverup as evidence of guilt.

The threats made by Richey are, pure and simple, acts separate and distinct from the one for which he was being tried. Proof of such threats can be admitted during the guilt phase only to show motive, opportunity, intent, plan, and so forth. (Evid.R. 404[B].) As the threats came after the events for which Richey was being tried, none of these factors can possibly be proved by evidence of later threats. Therefore the evidence is inadmissible for the guilt phase of trial, and it was error for the trial court to admit it.

Nor should evidence of the threats have been used in the sentence deliberations. The majority contends that this evidence is part of his "history, character, and background" and that any criminal wrongdoing is properly included in a presentence report. The cases cited for this proposition are easily distinguishable from the present situation. In State v. Cooey (1989), 46 Ohio St.3d 20, 544 N.E.2d 895, the presentence investigation report included under the heading "Prior Criminal Record" allegations for which the defendant had never been tried. The majority in that case held that the statements were permissible in the presentence report under "social history" of the defendant. The incidents referred to were a violent assault and a sexual assault on a small child, not jailhouse threats. In State v. Hutton (1990), 53 Ohio St.3d 36, 559 N.E.2d 432, it was the defendant's arrest record that was at issue. A defendant's arrest record is part of his "prior criminal record," and thus can be included in a presentence report. Id. at 43, 559 N.E.2d at 441. Richey's threats were not part of a "prior criminal record," as they occurred after the events for which he is being tried, and he has never been charged or convicted of anything stemming from the threats.

Evidence of Richey's threats relates to his history, character or background in only the most marginal way. Its prejudicial impact is clear from the court's own actions; the judges thought Richey so dangerous that they had him shackled during the trial and allowed deputies to carry firearms and search people entering the courtroom. Considering these factors, evidence of the threats was not properly used either in the guilt phase or in sentence deliberations.

B

Letter

While in pretrial custody, Richey wrote a letter to a friend in Scotland. The trial court originally suppressed the letter as irrelevant to either the guilt or penalty phase. The letter was later included in the presentence report.

The majority contends that "[a]rguably that letter was relevant to the sentencing decision." I fail to see how it could have been relevant. The letter is simply a written version of the same threats Richey made verbally,1 as well as more "other acts" evidence about events in Scotland which occurred years earlier. The letter is highly prejudicial, in particular Richey's reference to bringing back the death penalty in Scotland. The same objections made above to the admissibility of the verbal threats apply here. The letter is not part of a prior criminal record, and any relation to Richey's history, character and background is tenuous at best. This, together with its highly prejudicial nature, should have made the letter inadmissible in the sentencing deliberations.

In addition, Richey's objection to the letter was not waived. Error as to the letter had been brought to the trial court's attention in the original motion to suppress. It was prejudicial error for the trial court to have admitted the letter in the presentence report.2

III

Proportionality of the Death Penalty

Besides reviewing the claims of error and weighing aggravating circumstances against mitigating factors, we must

decide whether the sentence of death is excessive or disproportionate to the penalty imposed in similar cases. It is this last part of the analysis which most clearly reveals how inappropriate the death penalty is in this case.

Several cases are cited by the majority to show the proportionality of the death penalty in this case. However, if one reads those cases (which are merely listed and not analyzed by the majority), it is obvious that not one is remotely similar to this one. The defendant in State v. Bonnell (1991), 61 Ohio St.3d 179, 573 N.E.2d 1082, shot the victim at close range and then beat him. In State v. Lott (1990), 51 Ohio St.3d 160, 555 N.E.2d 293, the victim was directly doused with lamp oil and set on fire. In State v. Seiber (1990), 56 Ohio St.3d 4, 564 N.E.2d 408, the defendant had been roaming a bar and threatening patrons with a loaded gun. The victim refused to lie down when ordered, and defendant shot him in the back. In State v. Powell (1990), 49 Ohio St.3d 255, 552 N.E.2d 191, the defendant kidnapped a seven-year-old girl intending to rape her. He partially asphyxiated her and threw her out a fourth-story window. Although arson is involved in State v. DePew (1988), 38 Ohio St.3d 275, 528 N.E.2d 542, the victims all died of multiple stab wounds inflicted before the fire was started. In State v. Morales (1987), 32 Ohio St.3d 252, 513 N.E.2d 267, a twelve-year-old boy was savagely beaten to death in revenge for something his brother had done. The victim in State v. Buell (1986), 22 Ohio St.3d 124, 22 OBR 203, 489 N.E.2d 795, had been kidnapped, sexually assaulted and strangled. The victim in State v. Maurer (1984) 15 Ohio St.3d 239, 15 OBR 379, 473 N.E.2d 768, had been kidnapped, sexually assaulted and shot. In each case, the defendant had clear animus toward the victim, or harmed the victim in a direct, face-to-face encounter, or both.

Cases of transferred intent where the death penalty was imposed also involve face-to-face violent encounters between victim and defendant. For example, in State v. Sowell (1988), 39 Ohio St.3d 322, 530 N.E.2d 1294, defendant forced his way into the apartment where his intended victim was a guest. Rather than be escorted outside by the person who opened the door, defendant shot him in the head.

I find no case in Ohio where a defendant in a felony murder case has been put to death unless he had specific animus towards the victim, or a direct, violent, face-to-face encounter with the victim, or both.3 As discussed above, there is no evidence that Richey had specific animus towards Cynthia Collins. On the contrary, he showed concern for her life while the fire was in progress. Even if the defendant's intent can be inferred from the circumstances, or transferred from the animus shown towards others, the circumstances involve no specific animus or face-to-face violent encounter. There is a stunning difference between this case and those cited as comparable by the majority.

Under the Eighth and Fourteenth Amendments to the United States Constitution, as well as R.C. 2929.05, we are obligated to perform a meaningful proportionality review of the death penalty in every case. See Gregg v. Georgia (1976), 428 U.S. 153, 173, 187, 204-206, 223-224, 96 S.Ct. 2909, 2925, 2931-2932, 2939-2940, 2948-2949, 49 L.Ed.2d 859, 875, 882,

892-893, 902-903; see, also, Furman v. Georgia (1972), 408 U.S. 238, 92 S.Ct. 2726, 33 L.Ed.2d 346. Such a review deserves more than lip service and a listing of cases which are in no sense comparable to this one. There has been no meaningful proportionality review in this case. The death penalty is not warranted, and I must dissent.

Sweeney and Wright, JJ., concur in the foregoing dissenting opinion.

FOOTNOTES:

1 The threats in the letter were not even directed toward the parties threatened, but were more in the nature of boasts to Richey's friend in Scotland.

2 "* * * The report should include only such information as is directly relevant to the aggravating and mitigating circumstances. * * * " State v. Glenn (1986), 28 Ohio St.3d 451, 28 OBR 501, 504 N.E.2d 701, paragraph two of the syllabus.

3 The facts in the case of State v. Thompson (1977), 55 Ohio App.2d 17, 9 O.O.3d 190, 379 N.E.2d 245, are similar to those in this case. Firemen died as a result of fighting an arson fire in a restaurant. The court of appeals found that the trial judges were justified in finding intent from the act of arson, plus defendants' knowledge that others were actually exposed to the danger they created. The case was never reviewed by this court, nor was the death penalty imposed. I believe that it reaches too far to find intent to kill a fireman from the act of arson and the knowledge of danger alone. If this were the rule, any time someone dies in an arson fire the defendant would be guilty of aggravated murder. This essentially abrogates the long-standing Ohio rule that specific intent is needed for aggravated murder, and would render it no different from felony murder in other states.