OPINION
{¶ 1} This timely appeal comes for consideration upon the record in the trial court and Appellant's brief. Appellee did not file a brief in this matter. Appellant Brian Williams appeals the decision of the Youngstown Municipal Court finding him guilty of one count of Criminal Damaging in violation of R.C. 2909.06(A)(1), a misdemeanor of the second degree and sentencing him to ninety days of incarceration. Williams now alleges that his conviction was against the manifest weight of the evidence.
 {¶ 2} A review of the trial transcript reveals that Williams was discovered by police in the rental property owned by Donald Yuhasz, with Williams' three dogs surrounded by feces and urine. It appeared the house was being used for selling drugs, as the exterior doors were replaced with reinforced doors and multiple bags of drugs were found inside the home. It is clear from the record that Williams did not have permission to be on the property and was there long enough for his dogs to do substantial damage to the floors and carpeting of the home. In light of this evidence, we conclude the verdict is supported by the evidence and affirm the decision of the trial court.
 {¶ 3} On November 1, 2003, Williams was arrested by the Youngstown Police Department and charged with criminal damaging in violation of R.C. 2909.06. The case was heard at a bench trial and Williams was pronounced guilty by the trial court. The matter was set for sentencing at which time Williams was ordered to serve 90 days in the Mahoning County Justice Center. A stay was requested and granted.
 {¶ 4} As his sole assignment of error, Williams claims:
 {¶ 5} "The trial court denied Appellant Due Process under the Fourteenth Amendment due to the fact that his conviction was against the manifest weight of the evidence and the trial court's verdict was inconsistent with the evidence and testimony presented at trial."
 {¶ 6} Williams was convicted of violating R.C. 2909.06, the statute that prohibits criminal damaging, which provides:
 {¶ 7} "(A) No person shall cause, or create a substantial risk of physical harm to any property of another without the other person's consent:
 {¶ 8} "(1) Knowingly, by any means"
 {¶ 9} Williams claims that his conviction under that statute was against the manifest weight of the evidence presented at trial. When reviewing a manifest weight claim, this court's role is to examine whether the evidence produced at trial "attains the high degree of probative force and certainty required of a criminal conviction." Statev. Getsy (1998), 84 Ohio St.3d 180, 193. To do this, we sit as the "thirteenth juror", examine the entire record, weigh the evidence and all reasonable inferences, consider the credibility of witnesses, and determine whether the jury "`clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered.'" State v. Thompkins (1997), 78 Ohio St.3d 380, 387, quoting State v. Martin (1983) 20 Ohio App.3d 172, 175. "`The discretionary power to grant a new trial should be exercised only in the exceptional case in which the evidence weighs heavily against the conviction.'" Id. at 387, quoting Martin at 175.
 {¶ 10} Here, Williams argues that his conviction must be reversed as being against the manifest weight of the evidence simply because the State offered no direct physical proof that he committed the crime. However, the Ohio Supreme Court has stated:
 {¶ 11} "Convictions based on circumstantial evidence, rather than direct evidence, do not require any greater review." * * * [C]ircumstantial evidence may be more certain, satisfying and persuasive than direct evidence." State v. Richey (1992), 64 Ohio St.3d 353, 363.
 {¶ 12} At trial, there was testimony offered by Donald Yuhasz, the owner of the rental property located at 2119 Summer, that the property should not have been occupied by anybody at the time of the offense. On November 1, 2003 he was going to do some work on the rental property when he noticed that the front door had been changed and a car was in the driveway. He testified that the front door used to be solid oak with a screen door on it. It had been replaced with a steel door. There was a new screen door hanging off the front. The original door was lying on the front porch. The last time he had been to the residence was two weeks prior to November 1st.
 {¶ 13} He "knew something was wrong" and called the police with his cell phone. Yuhasz waited around the corner until the police arrived. When the police pulled up to the house, Yuhasz pulled in behind them. The police asked Yuhasz if anyone was supposed to be occupying the house and he told them "no". The police knocked on the door and nobody answered. They then asked Yuhasz for permission to knock down the door. The police went around back while Yuhasz waited. The police then came around to the front of the house with two boys that they put into the patrol car.
 {¶ 14} Yuhasz then went into the house and found three pitbulls and "crap" and "piss all over the place and it was just a mess." Yuhasz described the dogs as being one adult and two puppies. He explained that the dogs relieved themselves in the basement and the living room. There was carpet in the living room and dining room that had to be taken up because of all the feces. Yuhasz testified that he did not bring these dogs into the residence nor did he give permission to anyone to bring the dogs into the residence. He explained that he would not have had to tear up the carpet and refinish the floors if the dogs weren't brought in.
 {¶ 15} Yuhasz additionally testified that he had to buy all new locks for the doors since they had been replaced without his permission. There was also damage done to two windows where someone tried to pry open the window. Finally, someone was trying to light the furnace and a valve had to be replaced.
 {¶ 16} On cross examination, Yuhasz admitted that all of the damage occurred within a two week time frame. He did not witness the damage occurring to the residence.
 {¶ 17} Allegedly, however, Williams' mom had called Yuhasz and put Williams on the phone to inquire about the whereabouts of the dogs. Yuhasz told Williams where the dogs were and asked why he broke into the house. Williams told him that he didn't break into the house.
 {¶ 18} Officer Ervin then took the stand and explained that he was called to the scene on the day in question. He testified that someone voluntarily opened the back door before he kicked it in. A young black male opened the door and the officer pulled him to the ground and handcuffed him. There was another black male sitting on the couch who was later detained by the other officer. The two men claimed that they were watching the house for a friend.
 {¶ 19} After looking around the house, the officer discovered several clear bags of marijuana. Three pills and eighteen bags of marijuana were recovered. The officer testified that the drugs were packaged for sale suggesting that the house was probably a place used to distribute drugs.
 {¶ 20} The officer then testified about the damage done to the home by the dogs. He further testified that Williams referred to the dogs as his. After speaking to the owner and realizing that the men had no permission to be there, they were arrested and taken to the station.
 {¶ 21} Officer Aeppli then took the stand and testified that when he entered the home, there were trash and dog feces everywhere, at least twenty piles. There were a few holes in the walls and damage was done to either the water heater or the furnace. The officer then explained that the front door was made of metal. It had six boards across it and had two bars holding the door in place. The officer suspected that someone who was involved in the sale of drugs might secure a door in that manner. The officer then admitted on cross that he had no personal knowledge of how the damage was done to the house.
 {¶ 22} After hearing all of this testimony, the trial court announced its verdict: "Based upon what I have heard the most significant damage is the damage to the carpeting by the dogs. I have no difficulty in finding each of the defendants guilty of criminal damaging as charged in the complaint." (T. p. 46) Although the evidence is almost entirely circumstantial, it would be difficult to say that after hearing this evidence, the trial court clearly lost its way in finding Williams guilty. During trial, there was undisputed testimony that the dogs were owned by Williams and there was clearly damage done to the property, apparently by dogs.
 {¶ 23} Admittedly, the State could not put on direct evidence of how long the dogs and Williams had been there, and which dog defecated how many times and where, the law does not require such a high standard of proof. If that were so, convictions for crimes without eyewitnesses would never be upheld. It is for this reason that the Ohio Supreme Court held in State v. Jenks, 61 Ohio St.3d 259 (1991) "[c]ircumstantial and direct evident evidence inherently possess the same probative value and therefore should be subjected to the same standard of proof. When the state relies on circumstantial evidence to prove an essential element of the offense charged, there is no need for such evidence to be irreconcilable with any reasonable theory of innocence in order to support a conviction." Syllabus.
 {¶ 24} In this case Williams and his co-defendant were found in a home with three pit bulls claiming they were watching the house for a friend. The house had reinforced doors with six by fours and metal bars, and contained a good deal of drugs. Regardless of whether or not he believed he had permission to be in that home, it appears that Williams knowingly let his three pit bulls roam free in that house long enough for substantial damage to be done to Yuhasz's floor, which cost $900.00 to repair. Based on this evidence, we cannot say that the trial court, sitting as the trier of fact, clearly lost its way by finding Williams guilty of criminal damaging.
 {¶ 25} Accordingly, the judgment of the trial court is affirmed.
Vukovich, J., concurs.
Waite, J., concurs in judgment only.