[Cite as *State v. Barnes*, 2023-Ohio-897.]

COURT OF APPEALS
STARK COUNTY, OHIO
FIFTH APPELLATE DISTRICT


| | |
|---|---|
| STATE OF OHIO | JUDGES:<br>Hon. W. Scott Gwin, P.J. |
|     Plaintiff-Appellee | Hon. John W. Wise, J.<br>Hon. Andrew J. King, J. |
| -vs- | |
| | Case No. 2022 CA 00070 |
| JAMIE BARNES | |
|     Defendant-Appellant | O P I N I O N |


CHARACTER OF PROCEEDING:    Criminal Appeal from the Court of Common
Pleas, Case No. 2021 CR 00101


JUDGMENT:    Affirmed


DATE OF JUDGMENT ENTRY:    March 21, 2023


APPEARANCES:

For Plaintiff-Appellee        For Defendant-Appellant

KYLE L. STONE        D. COLEMAN BOND
PROSECUTING ATTORNEY        116 Cleveland Avenue, NW
VICKI L. DESANTIS        Suite 600
ASSISTANT PROSECUTOR        Canton, Ohio  44702
110 Central Plaza South, Suite 510
Canton, Ohio  44702-1413

*Wise, J.*

**{¶1}** Appellant Jamie Lee Barnes appeals his conviction on one count of Felonious Assault, entered in the Stark County Court of Common Pleas following a jury trial.

**{¶2}** Appellee is the state of Ohio.

<u>STATEMENT OF THE FACTS</u>

**{¶3}** For purposes of this Opinion, the relevant facts and procedural history are as follows:

**{¶4}** On March 11, 2020, the Stark County Grand Jury indicted Appellant Jamie Lee Barnes on one count of Felonious Assault, in violation of R.C. §2903.22(A)(1)(D)(1)(a), a second-degree felony, for allegedly causing serious physical harm to Duane Garman on or about November 17, 2020.

**{¶5}** On March 1, 2022, the case proceeded to jury trial. At trial, the state of Ohio presented testimony and evidence from Officer Steven Slack and the victim, Duane Garman, as follows:

**{¶6}** The victim, Duane Garman, testified that on November 17, 2020, he stopped at the Old Timers bar after work to meet Scott Steiner, a former colleague who was looking for a job. (T. Vol. 2 at 43, 139). Garman usually worked until 7:00 or 8:00 p.m., but left work early that day to meet Steiner. (T. Vol. 2 at 138, 143). Steiner was a regular at Old Timers. (T. Vol. 2 at 207). Garman had never been to this bar before so he googled the address and arrived in his Jeep pickup between 5:45 p.m. to 6:00 p.m. (T. Vol. 2 at 45, 139-140, 144, 149).

{¶7}     Once inside the bar, Garman encountered a man blocking his way with his head down who said, "I bet you didn't think you'd ever run into me again." (T. Vol. 2 at 43, 145). Garman was shocked to realize the man was Sam Cooley, a former truck driver for his company, who had been terminated over a year earlier for "some mishaps against the company policy." (T. Vol. 2 at 145, 148). Garman explained that the day Cooley was terminated from that position, Garman had been filling in for another employee and had to participate in Cooley's exit interview and termination. (T. Vol. 2 at 146).

{¶8}     Garman recalled that months after Cooley was terminated, Cooley had threatened Garman at a Circle K gas station. (T. Vol. 2 at 43, 146). Garman had pulled in to the gas station and, upon seeing Cooley there, he went over to say hello. *Id.*  He said Cooley was not happy to see him and told him, "You know, the only thing stopping me from moving furniture with you right now in this parking lot is those cameras over my head." (T. Vol. 2 at 147). Cooley told Garman, "between now and the next time you run into me, this is a small area, you will run into me, you better wonder if good old Sam found out that you weren't the guy to try to give me a bad reference." (T. Vol. 2 at 147).

{¶9}     Garman stated that he told two people he worked with about the threat, but let it go because he did not think it really had anything to do with him. (T. Vol. 2 at 147-148). Garman also told Steiner about the threat (T. Vol. 2 at 220). Steiner knew both Garman and Cooley through his previous employment at the same company. (T. Vol. 2 at 210).

{¶10}     However, during this encounter at Old Timers, Cooley apologized to Garman, stating he never should have threatened him, and shook Garman's hand. (T. Vol. 2 at 149). Garman saw Steiner and quickly left to talk to him and his fiancée. (T. Vol.

2 at 149). While Garman was looking at Steiner's resume, Cooley came over again, bought beers, and started talking and apologizing again for the previous threat. (T. Vol. 2 at 44, 81,149).

**{¶11}** Garman testified that Cooley started buying everyone beers, however Garman did not drink much because he wanted to get home. (T. Vol. 2 at 150). Garman stated that he thought Cooley was being overly nice but gave him the benefit of the doubt. (T. Vol. 2 at 150-151). However, Garman was nervous because he observed Cooley texting frequently on his phone, and he grew suspicious that Cooley was trying to stall for time. (T. Vol. 2 at 65-66, 69, 151-152, 154).

**{¶12}** Surveillance footage during this time showed Appellant Jamie Barnes, a black male, enter the bar and sit in the next to last seat on the opposite side of the bar farthest away from the other men. Barnes' seat was closest to the hallway where the bathrooms were located. (State's Exhibit 1A- Video #1, at 32 seconds). Barnes was distinctively dressed in a bright yellow hoodie with a Hall of Fame green logo design with lettering on the front and back of his hoodie, a ball cap, and black sweat pants with large white lettering on the side of the pants. A bartender handed Barnes a beer. (State's Exhibit-Video #1). Barnes's image can be clearly seen on all of the videos and the still photograph of Barnes, taken by Officer Slack, from the video. (State's Exhibits 1A-F; State's Exhibit 3). The video shows him drinking beer and filling his glass from a pitcher of beer. State's Exhibit 1A- Video #1, at 32 seconds. He can be seen leaving through the hallway to go smoke at one point and then re-enter to sit at his same seat and continue drinking. *Id.* at 6 minutes, 7 seconds; 12 minutes, 57 seconds. Outside surveillance recordings showed Barnes initially enter the bar. (State's Exhibit 1-D- Video #4, at 15

seconds). This black and white footage similarly shows Barnes enter and exit the bar several times. *Id.*

**{¶13}** On the surveillance video, Barnes leaves the bar and re-enters several times through the front door. (State's Exhibit 1-A- Video #1, leaving at 5 minutes, 30 seconds, and re-entering at 6 minutes, 45 seconds; Barnes leaving at 8 minutes, 43 seconds, and re-entering at 9 minutes, 30 seconds). Surveillance footage further shows Barnes texting on his phone. (*Id.* at 7 minutes). After two beers, Barnes then appears to pay his tab.

**{¶14}** Cooley can then be seen on his phone again. (*Id.* at 8 minutes). As Garman got up to leave, Cooley talked him into staying until he got back from the restroom. (T. Vol. 2 at 151). At this point, the video shows Cooley walk around the bar and go into a hallway near the ladies' bathroom past Barnes. Cooley was wearing a dark leather jacket, dark hat, and white pants. (State's Exhibit 1-A- Video #1, at 8 minutes, 24 seconds). Footage from the video then shows Barnes get up and follow Cooley into the hallway. (*Id.* at 8 minutes, 43 seconds). Surveillance footage from the hallway showed Cooley counting money and handing it to Barnes. (State's Exhibit 1-B- Video #2, at 8 minutes, 37 seconds). Barnes did not hand anything back to Cooley. Instead, he returned to his same seat. (State's Exhibit 1-A- Video #1, at 9 minutes, 30 seconds). Approximately 20 seconds later, the video showed Barnes turn his head as Cooley re-appeared and turned left to go to the men's room. He then re-entered the image and gradually walked back to the side of the bar where Garman and Steiner were located. (*Id.* at 10 minutes, 52 seconds). The video then showed Barnes leave the bar alone through the front door. (*Id.* at 11 minutes, 18 seconds).

**{¶15}** As Garman got ready to leave again around 6:00 p.m., he thanked Cooley for the beer, shook hands with him, and told him "we're good," but he later reflected that something still felt "wrong." (T. Vol. 2 at 44, 152; State's Exhibit 1-A- Video #1, at 11 minutes, 32 seconds). Cooley and Steiner remained at the bar with Steiner's fiancée. Garman, unaccompanied, left through the front door. *Id.*

**{¶16}** As seen from the outside surveillance footage, Barnes exited the bar and walked to the side of the building in the parking lot. (State's Exhibit 1-C- Video #3, at 11 minutes, 22 seconds; State's Exhibit #1-D- Video #4, at 11 minutes, 27 seconds). Garman exited the bar and then turned slightly towards Barnes. (*Id.* at 11 minutes, 42 seconds). As Garman walked outside, he paused because the cold caused his glasses to fog up. He also looked around to check his surroundings. Garman crossed the street carrying the manila envelope with Steiner's resume. (T. Vol. 2 at 153; State's Exhibit 1-C- Video #3, at 11 minutes, 35 seconds). As Garman turned to his right, he saw the only person in the parking lot, a black man just standing there, looking "very nervous, antsy, overanxious". (T. Vol. 2 at 192). Garman described the man as wearing a "bright, almost neon yellow sweatshirt" with lettering on the front. (T. Vol. 2 at 153-154). As Garman crossed the street he took another look at the man in the hoodie to get a good look at him. (T. Vol. 2 at 155; State's Exhibit 1-C Video #3, at 11 minutes, 45 seconds). Garman headed to the truck but turned to his right to look again and instead saw a black shadow in his peripheral vision. (T. Vol. 2 at 155).

**{¶17}** Outside security cameras showed Barnes follow Garman across the street, and then both men go out of view from the cameras. Within seconds, Barnes then re-emerged from across the street and can be seen walking down Tremont Avenue. (State's

Exhibit 1-D- Video #4, at 12 minutes, 8 seconds). A different angle from a third camera outside also showed Garman leaving the bar. (State's Exhibit 1-E- Video #5, at 11 minutes, 41 seconds). Barnes was already in the parking lot waiting for Garman. As Garman crossed the street, his shadow displayed on the street. As Barnes crossed the street behind Garman, his shadow also showed up. *Id.* At this point, Barnes' shadow is seen closing in behind Garman, until they both go out of range of the camera across the street. (*Id.* at 11 minutes, 57 seconds).

**{¶18}** Garman recalled seeing the black shadow and then remembered blacking out stating, "it was lights out." (T. Vol. 2 at 155). Garman recalled waking up after the attack, face down 20-25 feet from the front of his truck but not in the middle of the street. (T. Vol. 2 at 155, 195). Garman's glasses were gone, he was wet, and he tried to push himself up but his arm was not working. (T. Vol. 2 at 156). Garman was disoriented, and he realized his face was bloody, so he slowly made his way to his truck. (T. Vol. 2 at 156). Garman called 9-1-1 and told the operator what happened, but then said he could not stay there because people were coming out of the bar, and he did not feel safe. (T. Vol. 2 at 157). Garman did not know where the person was that hit him. (T. Vol. 2 at 158). The 9-1-1 operator told him to call when he was in a safe place, so Garman hung up and called his fiancée to let her know what happened as he drove slowly down Tremont Avenue.  (T. Vol. 2 at 158).

**{¶19}** Garman then stopped in a well-lit area where Garman's fiancée picked him up and took him to Aultman Hospital's emergency department. (T. Vol. 2 at 159). Garman testified that he had a broken nose, bone fractures in his cheek, a laceration over his right eye, a black eye, and a separated his shoulder. (T. Vol. 2 at 161). He stated that he had

trouble keeping his eye open for a while afterwards because of the swelling. *Id.* He also testified that when he was knocked unconscious and then fell to the ground, his shoulder separated from his clavicle and was excruciatingly painful. (T. Vol. 2 at 161). Garman testified he still has ringing in his ears and decreased range of motion to his dominant right arm. (T. Vol. 2 at 159, 168). His medical diagnoses included assault, head injury, a broken nose, facial cheek fracture, laceration over his right eye, black eye, head pain, right collarbone pain, and separation of his right shoulder and collarbone. (T. Vol. 2 at 162; State's Exhibit 4 at p. 9; State's Exhibits 2A-C). Garman was treated and released from the hospital and referred to an orthopedic surgeon. (T. Vol. 2 at 162).

**{¶20}** Garman testified that he called Scott Steiner, told him what happened, and asked Steiner to try to find his glasses and the manila envelope. (T. Vol. 2 at 190). Finally, Garman called the police department to make a report, and his fiancée drove him to the station from the hospital to give a statement. (T. Vol. 2 at 164).

**{¶21}** Officer Steven Slack from the Massillon Police Department, testified that on November 18, 2020, he was called to the police department lobby around 12:38 a.m., to speak with Garman. (T. Vol. 2 at 42, 45). Officer Slack noted Garman was in a sling, and that his face was bruised and bloody, and that he had come directly from the hospital. (T. Vol. 2 at 42, 45). Garman told Officer Slack that while crossing the street, right before the attack, he saw a man in a yellow hoodie with a design on the front coming towards him. (T. Vol. 2 at 44). Garman described the man to Officer Slack as a black male, approximately 6 feet tall, and between the ages of 27 and 40 years old. (T. Vol. 2 at 44). The next thing Garman knew he was waking up, lying on the ground, and realized he was injured and covered in blood. (T. Vol. 2 at 44). Garman confirmed that the man in the bar

with a yellow hoodie was the same man standing outside the bar when he left. (T. Vol. 2 at 202).

**{¶22}** Garman told Officer Slack about the prior threat from Cooley.

**{¶23}** During an interview with Scott Steiner, Steiner told Officer Slack that he was aware of a prior incident at Circle K where "there were some words exchanged between the two of them [Garman and Cooley]." (T. Vol. 2 at 219-220). Steiner further let police know that Cooley knew Jamie Barnes. (T. Vol. 2 at 219).

**{¶24}** In addition to speaking with Steiner. Officer Slack also spoke with two of the bartenders working at the Old Timers Bar that night, as well as the bar manager, and Steiner's fiancée. (T. Vol. 2 at 73).

**{¶25}** In light of the threat Cooley previously made to Garman, Officer Slack obtained a search warrant for Cooley's cell phone records. (T. Vol. 2 at 46). Officer Slack then went to Old Timers bar and two of the bartenders told him that the man in the yellow hoodie was not a regular patron. Officer Slack then contacted the manager and watched the surveillance videos from that night. (T. Vol. 2 at 47). Officer Slack identified both Garman and Cooley, along with Steiner and his fiancée on the video. (T. Vol. 2 at 49-50). Officer Slack identified a patron that met the description Garman provided walking into the bar. (T. Vol. 2 at 51). Officer Slack saw this patron leaving the bar and then coming back into the bar and taking his same seat. (T. Vol. 2 at 52). At one point, this patron met with Cooley in the hallway in front of the ladies' restroom. (T. Vol. 2 at 53). Officer Slack observed Cooley counting money and then giving it to this patron. (T. Vol. 2 at 56). The patron in the yellow hoodie then returned to his seat (T. Vol. 2 at 53). Cooley then went to the men's restroom, and returned to the bar where Garman was talking with Steiner.

(T. Vol. 2 at 54). The patron in the yellow hoodie then left the bar. (T. Vol. 2 at 54). Shortly thereafter Garman left the bar. (T. Vol. 2 at 54).

{¶26} Officer Slack described the video showing the man in the yellow hoodie [Barnes], from outside the bar on Tremont Avenue, in the parking lot. (T. Vol. 2 at 58). Video surveillance showed the man standing on the side of the building. Officer Slack testified that the man went in and out of the bar quickly. (T. Vol. 2 at 60). Officer Slack identified the man by his yellow hoodie with a design on the front chest and abdomen area, hat, and pants. (T. Vol. 2 at 58, 61).

{¶27} Officer Slack also observed Garman leaving the bar. (T. Vol. 2 at 61). Officer Slack explained he watched the man in the yellow hoodie walk towards Garman and saw the man reach into his waistband. (T. Vol. 2 at 61, 63). At that point, Garman and the man disappeared from view. (T. Vol. 2 at 61). Seconds later Officer Slack described the same man re-enter the image and then leave on foot, until he was no longer seen on the video. (T. Vol. 2 at 61-62).

{¶28} At the outset of his investigation, Officer Slack had not yet identified Jamie Barnes as the man from the bar wearing the yellow hoodie. However, based upon the fact that Garman told him Cooley had previously threatened him, and because Officer Slack saw Cooley texting on his phone, and the video footage, he got a phone warrant for Cooley's cell phone records from Verizon. (T. Vol. 2 at 65). The records showed text messages between Cooley and another person, 20 minutes prior to the assault. (T. Vol. 2 at 66). In total, there were about 20 text messages that day between Cooley and the other person. (T. Vol. 2 at 69).

**{¶29}** Officer Slack then used a program called TLO, a records database used by law enforcement, to identify Cooley and the other person's phone numbers. (T. Vol. 2 at 66). By inputting the phone number into the OHLEG (**Ohio** Law Enforcement Gateway) program, Officer Slack obtained a photograph of the person with that phone number, which he then used to match to the person that night in the yellow hoodie.

**{¶30}** As the video showed the person in the yellow hoodie also texting on his phone, Officer Slack then reached the conclusion that the person in the yellow hoodie was Jamie Barnes. (T. Vol. 2 at 67). Officer Slack testified that the still frame photo from the video he captured at the bar in the hallway matched with the driver's license picture of Barnes. (T. Vol. 2 at 68; State's Exhibit 1-F). Officer Slack further identified Jamie Barnes in open court. (T. Vol. 2 at 68).

**{¶31}** Following the state's witness, the State rested subject to the admission of its exhibits, and Appellant made a motion for acquittal pursuant to criminal rule 29, which was overruled by the trial court.

**{¶32}** Appellant called Scott Steiner as a defense witness. Following the testimony of Steiner, Appellant chose not to testify and rested his case. Appellant then renewed his motion for acquittal pursuant to criminal rule 29, which was again denied.

**{¶33}** On March 3, 2022, the trial concluded and the jury returned a verdict of guilty as to the sole count of felonious assault. At that time the trial court ordered a pre-sentence investigation.

**{¶34}** On April 6, 2022, the case proceeded to sentencing. At the sentencing hearing, the court suspended sentence and placed Appellant on three years of community control, which included, inter alia, that he serve a term of 30 days in the Stark County Jail.

(Sent. T. at 17, 4/29/2022 Sent. Judgment Entry at 5). Appellant was also advised that "[v]iolation of any of the terms or conditions of this community control sanction shall lead to either a more restrictive sanction, a longer sanction, or a prison term of eight (8) years". (4/29/2022 Sent. Judgment Entry at 6).

{¶35} Appellant now appeals, raising the following errors for review:

ASSIGNMENTS OF ERROR

{¶36} "I. THE STATE FAILED TO PRESENT SUFFICIENT EVIDENCE TO SUSTAIN A CONVICTION AGAINST THE APPELLANT, AND THE CONVICTION MUST BE REVERSED.

{¶37} "II. THE APPELLANT'S CONVICTION IS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE PRESENTED, AND MUST BE REVERSED.

{¶38} "III. THE APPELLANT WAS DENIED A FAIR TRIAL DUE TO PROSECUTORIAL MISCONDUCT."

**I., II.**

{¶39} We address Appellant's first and second assignments of error together, as they raise related issues of whether the judgment convicting Appellant of felonious assault is against the manifest weight and sufficiency of the evidence

{¶40} On review for manifest weight, a reviewing court is to examine the entire record, weigh the evidence and all reasonable inferences, consider the credibility of witnesses and determine "whether in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered." *State v. Martin,* 20 Ohio App.3d 172, 175, 485 N.E.2d 717 (1st Dist.1983). *See also State v. Thompkins*, 78 Ohio St.3d 380, 678 N.E.2d

541 (1997). The granting of a new trial "should be exercised only in the exceptional case in which the evidence weighs heavily against the conviction." *Martin* at 175.

**{¶41}** On review for sufficiency, a reviewing court is to examine the evidence at trial to determine whether such evidence, if believed, would support a conviction. *State v. Jenks,* 61 Ohio St.3d 259, 574 N.E.2d 492 (1991). "The relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." *Id.* at paragraph two of the syllabus, following *Jackson v. Virginia,* 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979).

**{¶42}** Appellant herein was convicted of felonious assault, in violation of R.C. §2903.11(A)(1), which states:

(A) No person shall knowingly do either of the following:

(1) Cause serious physical harm to another or to another's unborn;

**{¶43}** Appellant herein argues (1) the police failed to thoroughly investigate the crime in this case, and (2) the victim lacked credibility and "contradicted himself several times through his testimony." (Appellant's Brief at 17).

**{¶44}** Upon review, we find that based on the testimony of the victim Duane Garman and Officer Slack, including Garman's testimony as to his injuries, the Officer's testimony as to his investigation, the video and surveillance footage, the 20 text messages between Appellant and Sam Cooley, and the prior threats made by Cooley to Garman, the State presented sufficient evidence to prove that Appellant Barnes knowingly caused serious physical harm to Garman.

**{¶45}** The weight to be given to the evidence and the credibility of the witnesses are issues for the trier of fact. *State v. Jamison,* 49 Ohio St.3d 182, 552 N.E.2d 180 (1990). The trier of fact "has the best opportunity to view the demeanor, attitude, and credibility of each witness, something that does not translate well on the written page." *Davis v. Flickinger,* 77 Ohio St.3d 415, 418, 674 N.E.2d 1159 (1997). We note circumstantial evidence is that which can be "inferred from reasonably and justifiably connected facts." *State v. Fairbanks,* 32 Ohio St.2d 34, 289 N.E.2d 352 (1972), paragraph five of the syllabus. "[C]ircumstantial evidence may be more certain, satisfying and persuasive than direct evidence." *State v. Richey,* 64 Ohio St.3d 353, 1992-Ohio-44, 595 N.E.2d 915. It is to be given the same weight and deference as direct evidence. *State v. Jenks,* 61 Ohio St.3d 259, 574 N.E.2d 492 (1991).

**{¶46}** Appellant also argues that there were inconsistencies in the testimony at trial. The jury as the trier of fact was free to accept or reject any and all of the evidence offered by the parties and assess the witness's credibility. "While the trier of fact may take note of the inconsistencies and resolve or discount them accordingly * * * such inconsistencies do not render defendant's conviction against the manifest weight or sufficiency of the evidence." *State v. Frye*, 5th Dist. Richland No. 17CA5, 2017-Ohio-7733, 2017 WL 4176953, ¶ 47 quoting *State v. Johnson*, 5th Dist. Stark No. 2014CA00189, 2015–Ohio–3113, 41 N.E.3d 104, ¶ 61, citing *State v. Nivens*, 10th Dist. Franklin No. 95APA09–1236, 1996 WL 284714 (May 28, 1996). The jury need not believe all of a witness' testimony, but may accept only portions of it as true. *Id.*

**{¶47}** Based on the foregoing, we find that viewing the evidence in the light most favorable to the prosecution, the jury could find that Appellant assaulted and caused

serious physical harm to Duane Garman. The jury was in the best position to determine the credibility of the witnesses and could choose to believe the State's witnesses over Appellant's version of events. The jury thus had sufficient evidence to find Appellant guilty of felonious assault

{¶48} After a careful review of the entire record, weighing the evidence and all reasonable inferences and considering the credibility of the witnesses, this Court cannot conclude that the trier of fact clearly lost its way when it found Appellant guilty of Felonious Assault. Based on the foregoing, this Court does not find that Appellant's conviction was against the manifest weight of the evidence

{¶49} Accordingly, we find Appellant's conviction is supported by sufficient evidence and is not otherwise against the manifest weight of the evidence.

{¶50} Assignments of Error I and II are denied.

**III.**

{¶51} In his third assignment of error, Appellant argues he was denied a fair trial due to prosecutorial misconduct.  We disagree.

{¶52} Appellant identifies three statements made by the prosecutor which he asserts arise to prosecutorial misconduct and otherwise deprived him of his due process rights due to: (1) during opening statements the prosecutor said "This is a case about a man who embody [sic] what evil truly is, and that man is the Defendant, Jamie Barnes." (T. Vol. 2 at 28); (2) during closing arguments the prosecutor stated "This was the action of a man who embodied what evil truly is" (T. Vol. 2 at 250), and (3) during closing arguments the prosecutor stated "And I would submit to you that someone who attacks a

complete stranger, someone they don't know, for money, that they got paid by someone else, a person like that is evil." (T. Vol. 2 at 270).

**{¶53}** To address these arguments, we must first determine: (1) whether the prosecutor's conduct was improper and (2) if so, whether it prejudicially affected Appellant's substantial rights. *State v. Smith*, 14 Ohio St.3d 13, 14, 470 N.E.2d 883 (1984). The inquiry is guided by four factors: (1) the nature of the remarks; (2) whether an objection was made by counsel; (3) whether corrective instructions were given by the court; and (4) the strength of the evidence against the defendant. *Sidney v. Walters*, 118 Ohio App.3d 825, 829, 694 N.E.2d 132 (3d Dist.1997).

**{¶54}** Initially, we note that Appellant did not object to the allegedly improper statements. "A claim of prosecutorial misconduct is waived unless raised at trial, and if so waived, can serve as the basis for relief only if the conduct constitutes plain error." *State v. Franklin*, 97 Ohio St.3d 1, 2002-Ohio-5304, 776 N.E.2d 26, ¶ 24. Plain error is a discretionary doctrine to be used with the utmost care by the appellate court in exceptional circumstances to avoid a manifest miscarriage of justice where an obvious error affected substantial rights, meaning it was outcome determinative. *State v. Noling*, 98 Ohio St.3d 44, 2002-Ohio-7044, 781 N.E.2d 88, ¶ 62, applying Crim.R. 52(B).

**{¶55}** In examining the nature of the statements, we note that the challenged comments were made in the opening statement and closing arguments, which jurors were instructed not to consider as evidence. (T. Vol. 2 at 27, 239). The trial court instructed the jury that the evidence in Appellant's case does not include the indictment, opening statements, or the closing arguments. (T. Vol. 2 at 239) Moreover, the trial court told the jury that they were the judges of the facts, the credibility of the witnesses, and the weight

of the evidence. (T, Vol. 2 at 240). A presumption always exists that the jury followed the trial court's instructions. *State v. Loza* (1994), 71 Ohio St.3d 61, 79, 641 N.E.2d 1082; *Pang v. Minch*, 53 Ohio St.3d 186, 187, 559 N.E.2d 1313 (1990), at paragraph four of the syllabus, *rehearing denied*, 54 Ohio St.3d 716, 562 N.E.2d 163..

**{¶56}** As to the prosecutor's characterization of Appellant as evil, it has been held that "calling an act evil can be expected hyperbole in the ardor of the moment, but it has been said the prosecutor should not apply these types of derogatory terms to the defendant personally." *See State v. Liberatore*, 69 Ohio St.2d 583, 433 N.E.2d 561 (1982), fn. 9 (where the case was already being reversed for a new trial on unrelated grounds, the Court found extensive prosecutorial misconduct for many reasons, including the prosecutor's characterization of the defendant "in derogatory terms clearly designed to inflame the jury").

**{¶57}** However, while such characterization may be improper, we find no plain error. Based on our review of the entire case, the contested remarks were not outcome determinative and did not deny Appellant a fair trial. *Accord State v. Lundgren*, 11th Dist. Lake No. 90-L-15-140 (Sept. 14, 1993) (no plain error where prosecutor paraphrased from the bible, "you have an opportunity to put this evil from the midst of us"), *aff'd* 73 Ohio St.3d 474, 488, 653 N.E.2d 304 (1995) (improper comment but no plain error in guilt phase of death penalty case); *State v. Jefferson*, 2d Dist. Montgomery No. 15828 (Mar. 14, 1997) (no reasonable probability outcome was affected by the prosecutor's characterization of the defendant as "an evil man" during closing argument); *State v. Smith*, 1st Dist. Hamilton No. C-860865 (Mar. 16, 1988) (even though the appellate court was already reversing on various other grounds, it found no plain error where the

prosecutor called the defendant "evil," "vicious," "cruel," and a "piranha"), *rev'd on other grounds, State v. Smith*, 49 Ohio St.3d 137, 146, 551 N.E.2d 190 (1990) (upholding the convictions).

**{¶58}** Furthermore, while the prosecutor's statements in this case may have been improper, we cannot conclude, based on all of the evidence produced at trial, that there was a reasonable probability that, but for the prosecutor's statement, the result of the trial would have been different.

**{¶59}** Having found that Appellant was not prejudiced by the prosecutor's statements, we find Appellant's third assignment of error not well-taken and overrule same.

**{¶60}** For the reasons stated in the foregoing opinion, the decision of the Court of Common Pleas of Stark County, Ohio is affirmed.


By: Wise, J.

Gwin, P. J., and

King, J., concur.

JWW/kw 0313